TARA K. MCGRATH
United States Attorney
JANAKI G. CHOPRA
NICHOLAS W. PILCHAK
California Bar Nos. 272246/331711
Assistant U.S. Attorneys
880 Front Street, Room 6293
San Diego, CA 92101-8893
(619) 546-8817/9709
janaki.chopra@usdoj.gov
nicholas.pilchak@usdoj.gov

Attorneys for the United States

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.:  22-cr-2701-BAS |
| Plaintiff, | |
| v. | |
| | UNITED STATES' TRIAL BRIEF |
| DONALD DANKS (2),<br>JONATHAN DESTLER (3),<br>ROBERT LAZERUS (4), | Trial Date: July 30, 2024 |
| Defendants. | |

The United States of America, by and through its counsel, Tara K. McGrath, United States Attorney, and Janaki G. Chopra and Nicholas W. Pilchak, Assistant U.S. Attorneys, hereby files its trial brief.

**I**

**STATEMENT OF THE CASE**

**A.    The Charges**

On November 22, 2022, a federal grand jury in the Southern District of California returned a three-count indictment charging Defendants David Stephens (1), Donald Danks (2), Jonathan Destler (3), and Robert Lazerus (4) with conspiracy to commit securities

fraud and securities fraud, in violation of 18 U.S.C. § 371, 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5. Danks was also charged with a single count of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B).

**B.   Trial Status**

Danks, Destler, and Lazerus are scheduled to begin jury trial on July 30, 2024. Stephens is in Canada pending extradition and will not begin trial with his co-defendants. The United States expects its case-in-chief to last approximately 10 to 12 trial days. The Court has informed the parties that, except for the first day of trial, it will have modified trial days stretching from 8:30 a.m. to 2:30 p.m., with two short breaks.

**C.   Status of Counsel**

Danks is represented by retained counsel Patrick Hall. Destler is represented by retained counsel Skip Miller, Daniel Stephen Miller, Colin Rolfs, Andrew Young, and David Hunt. Lazerus is represented by appointed counsel Martha Hall and Adam Doyle.

**D.   Custody Status**

Defendants are all on pretrial release pending trial.

**E.   Interpreter**

None of the defendants nor the United States' witnesses require the assistance of an interpreter.

**F.   Jury Waiver**

Defendants have not filed a jury waiver.

**G.   Pretrial Motions**

The Court has denied pretrial motions from Destler to suppress evidence from a warrant search of his emails, ECF 67, 77; from Destler and Lazerus to sever defendants for trial, ECF 91, 96, 104, 127; from Danks for a bill of particulars, ECF 79, 127; from Destler and Danks to dismiss the indictment for failure to state a claim, ECF 78, 90, 161; and from Destler to dismiss the indictment or require the recusal of all prosecutors and agents, ECF 147, 187. The parties have filed approximately 50 motions *in limine*, beginning December 6, 2023. Those motions, and the Court's ruling on them, are summarized below:

| ECF | Mot. | Description | Court's Ruling |
|---|---|---|---|
| 142. Danks MILs to | | | |
| | 1. | Preclude Government From Referring to [Person A] as a "Victim" or Using the Term "Elder Abuse" (R-O: ECF 160) | **Granted** |
| | 2. | Exclude Testimony By [Person A's] Family, Financial Advisors, or Any Lay Witness About the Mental State of [Person A] (R-O: 160) | **Granted** in part / **Denied** in part |
| | 3. | Exclude Any Evidence Relating to the Settlement of the Texas, Washington, or Any Other State iMergent Lawsuits [Etc.] (R-O: 160) | **Granted** without prejudice |
| | 4. | Exclude All References and Questioning Regarding Civil Class Action Suits [Etc.] (R-O: 160) | **Granted** in part / **Denied** in part |
| | 5. | Exclude Evidence Relating to Mr. Danks's Lifestyle or Wealth and His 2015 IRS Audit (R-O: 160) | **Granted** in part / **Denied** in part |
| | 6. | Exclude References to the Non-Consensual Post-Indictment Sale of LOOP Stock By Danks (R-O: 160) | **Granted** |
| | 7. | Exclude Evidence Relating to the Sale of Trilogy, dThera, Fannatac, and Opti-Harvest Stock to Person A (R-O: 160) | **Denied** |
| | 8. | Exclude Mr. Lazerus's Statements Made to FBI Agent Tarwater in Both His Capacity as an Undercover Agent and While Interrogating Lazerus in February 2022 and Statements of Destler (R-O: 160) | **Deferred** |
| | 9. | Exclude Expert Testimony Due to Inadequate Notice Under F.R.Cr.P. 16 and Lack of Expertise Relating to Proffered Testimony (R-O: 160) | **Denied** |
| | 10. | For a Jury Questionnaire to Ensure the Selection of a Fair and Unbiased Jury (R-O: 160) | **Denied** |

| ECF | Mot. | Description | Court's Ruling |
|---|---|---|---|
| | 11. | For Additional Peremptory Challenges (R-O: 160) | **Granted** |
| | 12. | Bifurcate the Forfeiture Trial (R-O: 160) | **Granted** |
| | | | |
| 143. Destler MILs to | | | |
| | A. | Preclude Evidence of the "Ameritrade Incident" and Strike It from the Indictment (R-O: 160) | **Granted** without prejudice |
| | B. | Exclude Other Uncharged Conduct Under 404(b) (R-O: 160) | **Denied** as moot |
| | C. | Preclude the Government from Referring to [Person A] as a "Victim" or that He Suffered "Elder Abuse" (R-O: 160) | **Granted** |
| | D. | Preclude Collective References to Individual Defendants (R-O: 160) | **Denied** without prejudice |
| | E. | Permit Defendants to Cross-Examine Special Agent Tarwater on Credibility Questions Raised by a Judge (R-O: 160) | **Granted** in part / **Denied** in part |
| | F. | Do Not Allow Special Agent Tarwater to Testify in a Dual Capacity (R-O: 160) | **Granted** |
| | | | |
| 150. Lazerus MILs to | | | |
| | A. | Hold Hearing Under Section 3501 (R-O: 169) | **Denied** |
| | B. | Exclude Co-Conspirator Statements (R-O: 169) | **Denied** |
| | C. | Exclude Improper Summary Charts (R-O: 169) | **Deferred** |
| | D. | Exclude 404(b) Evidence (R-O: 169) | **Denied** |
| | E. | Admit Tarwater's Out-of-Court Statements (R-O: 169) | **Deferred** |
| | F. | Admit Statements Under Rule of Completeness (R-O: 169) | **Deferred** |

| ECF | Mot. | Description | Court's Ruling |
|---|---|---|---|
| | G. | Continue the Trial (R-O: 169) | **Granted** |
| | | | |
| 144. USA MILs to | | | |
| | A. | Admit expert testimony | |
| | | 1.  Peter Melley (R-O: 157/159/168) | **Granted**, but gov't to suppl. re match trades, etc. |
| | | 2.  Jeremy Tarwater (R-O: 157/159/168) | **Denied** |
| | | 3.  (Jonathan Joyce) (R-O: 157/159/168) | **Granted** implicitly |
| | | 4.  Ben McDonnell (R-O: 157/159/168) | **Granted** |
| | B. | Allow dual-role testimony (R-O: 157/159/168) | **Denied** |
| | C. | Admit *Bruton* statements (Lazerus, Destler) (R-O: 157/159/168) | **Granted** in part / **denied** in part |
| | D. | Admit inextricably intertwined / Rule 404(b) evidence (R-O: 157/159/168) | |
| | | 1.  Early stock transfers/nominees (R-O: 157/159/168) | **Granted** |
| | | 2.  Other Lazerus-induced Person A investments (R-O: 157/159/168) | **Granted** |
| | | 3.  TD Ameritrade Incident (R-O: 157/159/168) | **Denied** without prejudice |
| | E. | Preclude 608(b) evidence (CDCA case) (R-O: 157/159/168) | **Granted** in part / **Denied** in part |
| | F. | Exclude witnesses from courtroom (R-O: 157/159/168) | **Granted** |
| | G. | Preclude unnoticed advice-of-counsel defense (R-O: 157/159/168) | **Deferred** |
| | H. | Preclude evidence/argument re knowledge of unlawfulness (R-O: 157/159/168) | **Denied** |
| | I. | Exclude improperly noticed experts or evidence expert, other evidence (R-O: 157/159/168) | **Deferred** |
| 173 | | USA's MIL to Preclude Defense Expert Testimony | |

| ECF | Mot. | Description | Court's Ruling |
|---|---|---|---|
| | | A. Catherine Kowalewski (no R-O) | **Granted** unless defs. respond by 7/29 |
| | | B. Daniel Rondeau (no R-O) | **Granted** unless defs. respond by 7/29 |
| | | C. David Hunt (no R-O) | **Granted** unless defs. respond by 7/29 |
| | | D. Richard Weintraub (no R-O) | **Granted** unless defs. respond by 7/29 |
| | | | |
| 210 | | USA's MIL to Preclude Defense Expert Testimony | |
| | | A. Unspecified "Percipient W" | **Granted** |
| | | B. Peter Norell | **Granted** as to anything unnoticed |
| | | | |
| 215. Danks MILs to | | | |
| | 1. | Preclude Evid. of Laptop Clean-Up | **Granted** without prejudice |
| | 2. | Admit Fact that Brennan Wasn't Interviewed | **Granted** in part / **Denied** in part |
| | 3. | Preclude Brennan's Post-10/31/21 Fin. Statements (R-O 221) | **Granted** in part as moot |
| | 4. | Preclude Testimony re SARs | **Granted** as moot |
| | 5. | Disclose Grand Jury Testimony (R-O 221) | **Granted** in part / **Denied** in part |
| | | | |
| 216. Lazerus MILs to | | | |
| | 1. | Request *Brady*/*Giglio* re Tarwater (R-O 220) | **Denied** |
| | 2. | Exclude Tolls As Unreliable (R-O 220) | **Denied** |
| | 3. | Compel Evid. of FINRA Referrals & Results re Hindenberg (R-O 220) | **Denied** |
| | | | |

| ECF | Mot. | Description | Court's Ruling |
|---|---|---|---|
| 236. USA MILs to | | | |
| | 1. | USA MIL to Preclude Rosen (no R-O) | Govt may *voir dire* |
| | 2. | Preclude 608(b) Evidence (no R-O) | **Granted** |
| | | | |
| 256 | | USA M to Preclude Advice of Counsel Defense, or for Adequate Disclosures, Waiver (R-O 282) | [*See below*] |
| | | | |
| 260. Danks MILs to | | | |
| | 1 | Exclude Fiore / Danks Text Messages (R-O 273) | **Granted** in part / **Denied** in part |
| | 2 | Limit Cross of D's Wife to Non-Privileged Conversations (R-O 273) | **Deferred** |
| | 3 | Admit Prosecutor's Authorized Admissions as Evidence (R-O 273) | **Denied** |
| | | | |
| 261 | | USA M to Preclude Expert Testimony from Jason Carter (R-O 281) | **Granted** |
| | | | |
| 263 | | Lazerus M to Compel *Brady* (Data Copy Error) (R-O 275) | **Granted** if additional records exist |

As to ECF 256, the United States' motion to preclude an advice of counsel defense or, in the alternative, for adequate disclosures, the Court ordered the defense to (1) provide reciprocal discovery concerning the defense, and (2) submit to an *ex parte* hearing with the Court outlining the contours of such a defense before raising it.

The parties have also reached agreement on certain issues without the need for Court intervention. For example, Destler's counsel Skip Miller has agreed that he will not reference Miller's personal holdings of Loop stock before the jury.

## H.    Stipulations

The parties have met and conferred about stipulations and have reached agreements in principle on several stipulations to streamline trial evidence presentation. The United

States has provided written stipulations to the defense and is presently awaiting signed copies.

The anticipated testimonial and evidentiary stipulations are as follows:

1. <u>Testimonial</u>
   a. Date of Death of Person A;
   b. The time span that Danks served on the LOOP board of directors and audit committee; and
   c. The fact that Robert Lazerus was not a broker, broker-dealer, or investment adviser during the period of the charged conspiracy.

2. <u>Evidentiary</u>
   a. Authenticity and foundational requirements for 902(11) records;
   b. Authenticity and foundational requirements for records from seized defendants' cellphones, email accounts, and iCloud accounts;
   c. The publicly-available stock price chart for LOOP stock from November 11, 2015, to February 3, 2022; and
   d. Identities of individuals on undercover recordings.

**I.    Discovery**

The United States has produced substantially more discovery than is required under the discovery rules and will continue to comply with its statutory and constitutional discovery obligations. All three defendants have produced some reciprocal discovery to the United States, except as to the anticipated advice of counsel defense. Despite the Court's order about reciprocal discovery for the advice of counsel defense, the United States has not received any reciprocal discovery related to that defense.

**II**

**<u>STATEMENT OF FACTS</u>**

**A.    Background on Microcap Stock Fraud Schemes**

The indictment charges defendants with engaging in a market manipulation scheme to artificially inflate the price of stock, then fraudulently profit from its sale. Market

manipulation and pump and dump schemes feature a number of typical hallmarks. Conspirators typically (1) have, or take control of, a company's management and stock; (2) conceal that control; (3) issue shares to the public; (4) deceive transfer agents and brokerage firms in connection with the deposit and transfer of shares; (5) engage in manipulative trading of the stock to artificially improve the stock chart; (6) coordinate exaggerated press releases with promotional campaigns; (7) sell the stock at artificially inflated prices; and (8) distribute the proceeds.

To the uninitiated, many of these activities may appear innocuous. But taken together, a combination of these and similar steps makes for a scheme to defraud. *See United States v. Jenkins*, 633 F.3d 788, 793 (9th Cir. 2011) (affirming securities fraud and money laundering convictions for "'pump and dump' scheme during which [defendants] conspired to secretly acquire millions of shares of UniDyn Corporation stock, artificially inflate its value, sell it for significant profit, and launder the proceeds."); *United States v. Laurienti*, 611 F.3d 530, 534 (9th Cir. 2010) (affirming restitution order in case involving a "pump and dump scheme," and noting the "overwhelming evidence that the criminal conspiracy existed and that the owners and managers were complicit"); *United States v. Zolp*, 479 F.3d 715, 717 (9th Cir. 2007) (overturning sentence in pump and dump scheme, and providing the following definition: "Pump and dump schemes 'involve the touting of a company's stock (typically microcap companies) through false and misleading statements to the marketplace. After pumping the stock, fraudsters make huge profits by selling their cheap stock into the market.'"); *United States v. Skelly*, 442 F.3d 94, 96 (2d Cir. 2006) (affirming convictions where defendants "engaged in what is commonly called a 'pump and dump' scheme: they used manipulative techniques to artificially inflate ('pump') the price of certain thinly-traded securities in which they held a substantial interest, and then used fraudulent and high-pressure tactics to unload ("dump") the securities on unsuspecting customers."); *S.E.C. v. Curshen*, 888 F. Supp. 2d 1299, 1307 (S.D. Fla. 2012) ("A pump-and-dump stock scheme is a classic violation of these [the anti-fraud] provisions.").

**B.      Overview of the Charged Conspiracy**

In late 2014, Destler and Danks sought out a shell company with publicly tradable shares to merge with Loop Holdings, then a private company. To that end, Destler introduced Loop's CEO, Canadian Daniel Solomita, to co-defendant Stephens in an October 3, 2014 email copying Danks, writing that Stephens was "a close contact of ours and the principal representing a public shell candidate we are looking to secure." At the time, Stephens had his eyes on acquiring First American Group, Inc. ("FAMG"), a shell company owned by Canadian Talal Yassin, that was extremely well-positioned for use in a market manipulation scheme. That's because, years before, Yassin had registered an offering of FAMG shares with the SEC such that the shares could be publicly-traded.[1] The same day as Destler's email, Loop Holdings, Inc. signed a consulting agreement with Destler and Danks and their firm, Touchstone Advisors, Inc., providing that Touchstone would assist in a variety of areas, including corporate finance and investor communications strategy. In June 2015, Stephens and Yassin, with the assistance of another Canadian, Steve Bajic, struck a deal, and conducted a reverse merger that transformed Loop Holdings and FAMG into Loop Industries, Inc. ("LOOP"). Danks was appointed to LOOP's board of directors on June 29, 2015, and also began assuming the functions of the audit committee the same day.

Following the reverse merger, there were approximately 29.8 million total outstanding shares of LOOP, 23.3 million of which were restricted.[2]  Of the restricted

---

[1]      According to SEC records, in March 2010, a company named "Radikal Phones, Inc." was formed. Several months later, in November 2010, Radikal Phones changed its name to FAMG. In 2011 and 2012, FAMG made a private offering of stock to 37 straw investors based in India and Lebanon, issuing them 521,264 shares. FAMG also filed its Form S-1 with the SEC in March 2011, effectively registering it as a publicly-traded company. A Seattle-based attorney, Thomas Puzzo, assisted with the S-1 filing, represented both sides of the reverse merger, and held onto the stock certificates for all 37 straw investors.

[2]      Restricted shares are unregistered shares, often given to company employees or insiders, whose trading on a public market is restricted until certain conditions are met.

stock, 17 million shares went to Solomita, while Danks and Destler received 1 million each. The remaining 6.5 million shares were unrestricted, or free-trading—all effectively controlled by Stephens. Large blocks of the free-trading shares were transferred from Stephens to other entities provided by Blacklight, S.A. (a Swiss-entity), Steve Bajic, and Fred Sharp (another Canadian), for no or virtually no consideration.[3] The nominee entities controlled by Blacklight, Bajic, and Sharp then transferred shares back to Stephens (or to entities controlled by him) and to entities controlled by Danks and Destler, all at Stephens' direction. For example, Bajic-controlled entity Norfolk Heights Ltd. received 498,750 free-trading shares of LOOP from Sharp's controlled nominee entity, who had received it from LOOP's pre-merger shareholders. Bajic's Norfolk then transferred (a) 100,000 of these shares to Destler and Danks' entity, Touchstone Advisors, Inc. and (b) 350,000 shares to another Destler and Danks entity, Vertical Leap Advisors LLC. Transfer agent records reflect the transfers between Norfolk and Touchstone/Vertical Leap were for no

---

Unrestricted, or "free-trading," shares are not subject to such limitations and may be readily traded in the market.

[3]     Blacklight, Bajic, and Sharp were all in the business of facilitating market manipulation schemes by setting up offshore nominee entities and buying and selling stock through accounts held in the names of these nominees. Blacklight and its owners have since been indicted in the Southern District of New York and are pending criminal proceedings. *See United States v. Kenneth Ciapala, et al.*, 19-cr-00874-GBD (S.D.N.Y.). Steve Bajic was charged in the District of Massachusetts and pleaded guilty to conspiracy to commit securities fraud there. *See United States v. Bajic*, 23-cr-10306-LTS (D. Mass.). Sharp and his co-conspirators have been indicted in the District of Massachusetts. *See United States v. Frederick Sharp, et al.*, 24-cr-10002-NMG (D. Mass.).

consideration—i.e., the records claimed the transfers were a "gift." Bajic received a commission of 4% from Stephens for his services. The transfers are depicted below:



Contemporaneous emails reflect that the distribution of LOOP unrestricted shares directed by Stephens to Danks and Destler (through the nominee entities) was not a coincidence but rather part of a deliberate scheme. On September 22, 2015, Solomita emailed Danks and Destler and attached an image file listing a distribution plan for the 6.5 million unrestricted shares from the reverse merger (the "total shell"). Recipients included Solomita (2 million shares), the Danks family trust (1 million shares), Destler (1 million shares), Stephens (850,000 shares), Danks-controlled entity Ventanas Capital[4] (590,000 shares) and Danks and Destler's entity, Vertical Leap Advisors (575,000 shares). In response to this email and proposed distribution, which gave Stephens a significant number of shares, Solomita replied, "I hope this is a joke." But, in truth, the distribution mapped out in the email matched almost exactly the destination of the post-reverse merger LOOP shares—except that Destler and Stephens mostly held their shares in entity accounts rather than in their own names. In fact, Danks replied to Solomita's email the same day, writing

---

[4]    The nominal head of Ventanas Capital, Michelle Fiore, was (and is) a close personal associate of Danks. Despite Fiore's nominal position, Danks essentially controlled all aspects of Ventanas, including its brokerage and bank accounts. Predictably, Ventanas does not appear to have any legitimate business, but instead appears to be another nominee entity established by Danks to trade LOOP shares.

"Why would it be a joke?"  Below is a side-by-side comparison of the share distribution plan detailed in the email and what actually transpired post-reverse merger:

| Per Email Dated September 22, 2015 | | Per Transfer Agent Records | | |
| --- | --- | --- | --- | --- |
| Name | No. of Shares | Name | No. of Shares | |
| Daniel Solomita | 2,000,000 | Daniel Solomita: | 2,000,000 | |
| | | Daniel Solomita | | 1,600,000 |
| | | Goldie Holdings Inc. [1] | | 400,000 |
| Danks Family Trust | 1,000,000 | Danks Family Trust: | 750,000 | |
| Jon Destler | 1,000,000 | Touchstone Advisors Inc.: | 900,000 | |
| Dave Stephens | 850,000 | David Stephens: | 490,800 | |
| | | David Stephens | | 317,050 |
| | | Wisdom Chain Limited [2] | | 125,000 |
| | | Norfolk Heights Ltd. [3] | | 48,750 |
| Ventanas Capital | 590,000 | Ventanas Capital LLC: | 675,000 | |
| Vertical Leap Advisors | 575,000 | Vertical Leap Advisors: | 575,000 | |
| Left Behind with Shell | 65,800 | Left Behind with Shell: | 50,000 | |
| Joe - (Xuesong Yu) | 420,000 | Other Individuals/Entities: | 1,075,000 | |
| | | Goldie Holdings Inc. [4] | | 375,000 |
| | | Giovanni Catino [5] | | 500,000 |
| | | Chester Griffiths | | 50,000 |
| | | Robert Lazerus | | 50,000 |
| | | Timothy Joyce | | 100,000 |
| Total Shell | 6,500,800 | Total | 6,515,800 | |

Because virtually all of LOOP's free-trading shares were initially effectively controlled by a tight-knit group (Stephens, Destler, and Danks), that group exercised almost total control over the trading in its stock from the scheme's inception. They determined whether, when, and at what price to allow the stock to trade on the market. And as shown by their subsequent coordination and collaboration, they set about to steadily manipulate the stock price to increase its value, with the goal of getting it uplisted to the NASDAQ— a goal they achieved in November 2017.[5] The defendants did this to monetize their

---

[5]     At trial, the United States expects an expert witness to testify that uplisting to the NASDAQ is significant for a microcap company because it enhances awareness and visibility of the stock and the company, and signals to the market and potential investors that the company is legitimate, thereby encouraging more investor buying and potentially driving up the stock price. In pump and dump and market manipulation schemes, uplisting to the NASDAQ may allow perpetrators to better conceal their manipulative trades among higher volume trading in the stock and may facilitate shareholders to obtain margin loans on their stock positions. The expert is also expected to testify that in the lead-up to a

13

holdings in LOOP without ever revealing to the public (or to their own brokerage firms) that they controlled virtually all of LOOP's stock and worked in concert with each other to carefully coordinate its sale.[6]

One of the primary ways the conspirators manipulated the LOOP share price and market trading was through Lazerus, who operated as an unregistered broker touting a variety of Danks- and Destler-linked investments to potential investors, including A.B. (identified as Person A in the indictment). In their written communications, Danks repeatedly pushed Lazerus to get A.B. to buy thousands of shares of LOOP in the open market at specific indicated prices. For example, on November 2, 2017, Danks sent a WhatsApp chat to Lazerus: "Any luck with [Person A] in the market[?]  We need the stock to firm up at about $13-$14." Likewise, on November 8, 2018, Danks texted Lazerus, "Roberto, is there anyway you can get [A.B.] to come into this market today?  Somebody's hitting us hard with long selling."  For his part, Lazerus received commissions on these stock sales from Danks and Destler in the form of cash or LOOP stock.[7]

Importantly, the proceeds of these stock sales confirmed that the real parties in interest were the co-conspirators. For example, in October 2017, Person A paid $1,410,475 to Touchstone Advisors Inc. for 122,650 shares of LOOP, which had been transferred to Touchstone by Stephens shortly before. Following the payment, Touchstone Advisors

---

NASDAQ application, those involved in pump and dump schemes of microcap companies may utilize various market manipulation techniques to increase investment and interest in the company to drive up stock price and volume.

[6]    Danks and Destler also monetized their LOOP stock without selling it, by taking out extensive margin loans against the value of their holdings. This was a double gain: they could leverage and profit off the value of their stock while also avoiding depressing the stock price by selling large quantities of shares into a relatively thin market.

[7]    Market analysis shows that A.B.'s trades were an enormous share of the trading volume for LOOP stock, especially during calendar year 2017, when the conspirators were working steadfastly to get LOOP uplisted to the NASDAQ. At that time, the share price rose from under $5.00 to a peak of over $18.00 per share. Many days, A.B.'s trades represented well over half of the LOOP shares traded in the market.

wired $1,318,487.50 (or 93 percent) to Stephens.  The balance of A.B.'s payment was split in thirds: one third to Lazerus (via a check with memo field: "[Person A] Loop Trade"), one third to the Danks Family Trust, and one third that remained in Touchstone's bank account.

To facilitate these stock sales, Destler and Danks made false statements to their brokerages to conceal their control and affiliate status.  For example, Destler signed a series of forms enabling him to deposit LOOP stock into a Wilson-Davis account set up for Touchstone Advisors, Inc. None of the forms mentioned Danks (Destler's partner in Touchstone), and Destler attested that he was not an "officer, director or 10% (or more) shareholder of a publicly-owned company." Destler also affirmed, under penalty of perjury, that he had not solicited (and would not solicit) buy orders in connection with the sale of the deposited stock, and that he had not made (and would not make) any payment to any other person in connection with the sale of the deposited stock.  Yet, as set out above, as Destler knew, Destler's long-time partner Danks regularly pushed Lazerus to solicit A.B. to buy LOOP stock, and Lazerus was paid a commission to do so.

Danks made his own false statements to conceal his control over LOOP and its stock while managing its trading.  For example, in May 2017, Danks obtained limited power of attorney over the Ventanas Capital Charles Schwab brokerage account, which was used to trade significant quantities of LOOP stock. In papers associated with his account authorization, Danks falsely claimed that he was not a director of a publicly-held company, when in fact he was then serving on LOOP's board of directors, at a time when the Ventanas Capital brokerage account held and sold only LOOP stock. Danks also falsely attested that he was not a 10% shareholder of a publicly held company. Danks and Destler's false statements enabled them to deposit and sell LOOP stock through their entities while concealing that they, themselves, were significant controlling shareholders.

Throughout this period, Stephens, Destler, and Danks continued to profit through their shares of LOOP stock, notably through Lazerus-induced purchases by A.B. and others.  Beginning in February 2020, Lazerus communicated with an undercover FBI agent

(SA Jeremy Tarwater or the "UCE"), who posed as an investor looking for good investment opportunities. In a series of recorded calls and meetings, Lazerus told the UCE about upcoming anticipated "news" from LOOP and urged the UCE to buy shares.  In one of the conversations, on June 16, 2020, Lazerus discussed arrangements to provide more information to the UCE "down the road," and the possibility that Lazerus would be compensated 10% of the UCE's profits as an effective commission for Lazerus' assistance. On a June 24, 2020 call, Lazerus told the UCE he preferred to be compensated in cash.

In a May 20, 2021 recorded meeting, Lazerus told the UCE that LOOP had signed an agreement with SK Group that would be announced around June 1, 2021, including processing plants in Korea and a licensing agreement.  Lazerus told the UCE that Solomita gave this information to Destler, who gave it to Lazerus. In a recorded call the next day, Lazerus told the UCE that Destler tells him (i.e., Lazerus) things in confidence.  Lazerus later added, in a WhatsApp chat, that one component of the SK Global deal was an agreement to buy $56 million of LOOP stock at $12 per share.  Lazerus claimed that he had "just got off the phone with Jon"—i.e., Destler.  Sure enough, on or about June 23, 2021, LOOP issued a press release titled "SK Global Chemical to Acquire 10% Equity Stake in Loop Industries, Companies Announce Strategic Partnership to Bring Sustainable and Circular Plastics to Asian Market." The release included details about SK Global's agreement to purchase $56.5 million shares of LOOP at $12 per share.

Altogether, the defendants made just over $11 million from their scheme. The co-conspirators used the proceeds of their stock fraud in a variety of ways, one of which is charged in Count 3.  Specifically, on or about February 6, 2019, Danks made a $511,117.79 withdrawal via a margin loan against the LOOP stock held in his account.  He applied the funds to the purchase of a home in Newport Beach, California, which is charged in the forfeiture section of the indictment and will be addressed at a bifurcated forfeiture proceeding in this trial.

## III

## <u>LEGAL ISSUES</u>

**A.    Essential Elements and Relevant Case Law**

The United States has separately tendered proposed jury instructions.  ECF 277, 278.  The elements of the charged crimes are briefly restated here for convenience.  The United States also tendered proposed verdict forms.  ECF 276, 279.[8]

1. <u>Conspiracy to Commit Securities Fraud and Securities Fraud</u>

The elements of a conspiracy charged under 18 U.S.C. § 371 are:

1. There was an agreement among two or more persons to commit an offense;

2. The defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

3. One of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

*See* Ninth Circuit Model Criminal Jury Instruction 11.1 (2022 Edition).

2. <u>Securities Fraud</u>

The elements of securities fraud charged under 15 U.S.C. § 78j(b) are:

1. The defendant willfully used a device or scheme to defraud someone, made an untrue statement of a material fact, failed to disclose a material fact that resulted in making the defendant's statements misleading, or engaged in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person;

---

[8]    The proposed verdict form for the liability phase of trial was filed jointly, as all parties had previously agreed upon its form. ECF 276.  At the *in limine* hearing, however, Lazerus withdrew his consent based on his claim that the verdict form should require a special finding under *Apprendi* before defendants could be subject to imprisonment following any conviction, citing Danks's argument about 15 U.S.C. § 78ff. *See* ECF 259. This is an incorrect statement of the law.  *See United States v. Tarallo*, 380 F.3d 1174, 1192 (9th Cir. 2004) ("[The final clause of 15 U.S.C. § 78ff(a)] does not run afoul of *Apprendi* because it establishes a partial affirmative defense, not an element of the crime.").

17

2. The defendant's acts were undertaken, statement was made, or failure to disclose was done in connection with the purchase or sales of LOOP Industries Inc.'s stock;

3. The defendant directly or indirectly used the wires in connection with these acts, making this statement, or this failure to disclose; and

4. The defendant acted knowingly.

*See* Ninth Circuit Model Criminal Jury Instruction 15.47 (2022 Edition). The Model Instruction provides clarifications about "willfully" and "knowingly" as used in these instructions, including the notation that "[a]cting willfully does not require that the defendant know that the conduct was unlawful." *Id.* The Model Instruction provides that "[a] fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making the decision to [purchase] [sell] securities." *Id.* In addition, the Model Instruction provides that "[i]t is not necessary that an untrue statement passed through or over the wire so long as the wire was used as a part of the purchase or sale transaction. It is not necessary that the defendant made a profit or that anyone actually suffered a loss." *Id.*

3. <u>Money Laundering</u>

The elements of money laundering charged under 18 U.S.C. § 1956(a)(1)(B) are:

1. The defendant [conducted] [intended to conduct] a financial transaction involving property that represented the proceeds of securities fraud;

2. The defendant knew that the property represented the proceeds of some form of unlawful activity; and

3. The defendant knew that the transaction was designed in whole or in part to conceal or disguise the [nature] [location] [source] [ownership] [control] of the proceeds.

*See* Ninth Circuit Model Criminal Jury Instruction 18.4 (2022 Edition). Title 18 U.S.C. § 1956(c)(4) defines "financial transaction" as "(A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movements of funds by wire or

other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate commerce or foreign commerce in any way or degree[.]" The Ninth Circuit has held that "the use of normal banking channels is enough to establish the interstate commerce element of a money laundering offense under 18 U.S.C. § 1956. *United States v. Bazuaye*, 240 F.3d 861, 864–65 (9th Cir. 2001).

**B.    Trial Evidence**

1.  <u>Rule 104</u>

On July 13, 2024, the United States filed its notice of intent to admit business records under Fed. R. Evid. 902(11), ECF 294, building on a general letter notice provided December 1, 2023.  As set out above, the United States expects that defendants will likely stipulate to the foundation, authenticity and hearsay exceptions applicable to such documents, while reserving other potential objections.  Absent a suitable stipulation, or with respect to other applicable documents, the United States may ask the Court at trial to resolve threshold admissibility questions under Fed. R. Evid. 104(a).

In general, a "proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). To support such a finding, the proponent "need only make a prima facie showing of authenticity" and "establish a connection between the proffered evidence and the defendant." *United States v. Tank*, 200 F.3d 627, 630 (9th Cir. 2000). Disputes over authentication should be about whether it is reasonably likely that the evidence is what the proponent says (e.g., an authentic copy of an email or text message), not over the evidence's probative value. The courts can therefore properly "admit[] evidence that meets the minimum requirements for authentication under

the Federal Rules of Evidence" and let opposing counsel "argue that the jury should give the evidence minimal weight." *United States v. Ortiz*, 776 F.3d 1042, 1045 (9th Cir. 2015).[9]

"The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege." *United States v. Evans*, 728 F.3d 953, 960, n. 5 (9th Cir. 2013) (quoting Fed. R. Evid. 104(a)). Admissibility determinations must be "established by a preponderance of proof" and "the evidentiary standard is unrelated to the burden of proof on the substantive issues, be it a criminal case." *Bourjaily v. United States*, 483 U.S. 171, 175 (1987) (citation omitted). *Id.* Because the Rules of Evidence do not apply at Rule 104 hearings (other than those involving privilege), courts may consider hearsay in determining preliminary questions of admissibility. *Bourjaily*, 483 U.S. at 178-79; *see also* Fed. R. Evid. 1101(d). Citing to the Advisory Committee Notes for Rule 104, the Supreme Court noted that federal judges may "hear any relevant evidence, such as affidavits or other reliable hearsay." *Bourjaily*, 483 U.S., n.2.

Accordingly, in the absence of a suitable stipulation from all defendants, if any defendant challenges the authenticity and threshold admissibility of noticed records, the United States reserves the right to ask the Court for a preliminary ruling outside the presence of the jury under Fed. R. Evid. 104.

2. Co-Conspirator Statements

Rule 801(d)(2)(E) provides that a statement "made by [an opposing] party's coconspirator during and in furtherance of the conspiracy" is not hearsay. For such

_____

[9]    The Ninth Circuit has held that admission of records based on Certifications of Authentication (COAs) from custodians of records without the testimony of a live witness does not violate a defendant's Sixth Amendment right to confront witness. *United States v. Anekwu*, 695 F. 3d 967, 974 (9th Cir. 2012). *Anekwu* found that the COAs were non-testimonial because the certifications did not interpret what the records contain or certify their substance or effect, or otherwise create a record for the sole purpose of providing evidence against a defendant. As such, the use of the COAs was found to be consistent with *Crawford v. Washington*, 541 U.S. 36, 51–52 (2004). *Id.*

statements to be admissible as coconspirator statements, the government must demonstrate by a preponderance of the evidence that: (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the statements were made during the course, and in furtherance of, the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *see also United States v. Liera*, 585 F.3d 1237, 1245-46 (9th Cir. 2009). *Crawford v. Washington*, 541 U.S. 36, 56 (2004). "While that Rule requires that both the declarant and the party against whom the statement is offered be members of the conspiracy, there is no requirement that the person to whom the statement is made also be a member." *United States v. Gupta*, 747 F.3d 111, 125 (2d Cir. 2014) (quotation omitted); *see also United States v. Williams,* 989 F.2d 1061, 1068 (9th Cir. 1993). And statements to induce the listener's assistance with the conspiracy's goals are "in furtherance of" the conspiracy for purposes of the Rule. *Gupta*, 747 F.3d at 125.

Here, among the hundreds of exhibits disclosed to the defense[10] and the anticipated trial testimony, there is ample evidence to support a preliminary finding that a conspiracy existed, that the defendants were members, and that statements to be offered under Rule 801(d)(2)(E) were made in furtherance thereof. While the clearest evidence comes from the hundreds of undercover recordings, emails, and text messages in which the defendants and their associates carried out the conspiracy in real time, the proof also extends far beyond those voluminous statements.

First, cooperating defendant Steve Bajic will testify that he helped write the earliest chapter of the conspiracy by coordinating a confederation of covert corporate entities to conceal Stephens's control of the entire fleet of free-trading shares of Loop. In fact, Bajic has pled guilty to engaging in a conspiracy to commit securities fraud for the same kind of conduct to which he will testify at this trial.

_____

[10]   As provided in the Court's pretrial scheduling order, ECF 244, the United States disclosed to the defense on July 9, 2024 an exhibit list containing over five hundred exhibits.

Second, stock trading data show repetitive trades involving the co-defendants and their associates revealing deliberate attempts to manipulate the price of Loop stock throughout the conspiracy.  As disclosed in the United States' summary charts[11] and noticed exhibits, some trades were patently suspicious and matched common techniques for manipulative trading such as cross-trading, laddering, and attempts to mark the close.  In fact, during the conspiracy, Danks's account received a warning email from his brokerage for his suspicious trading activity, which he immediately forwarded to Destler.  Lazerus himself received a brokerage warning email that his account had been identified as a "control account" due to his deposit of control shares.  Furthermore, the trading data standing alone also indicates that defendants likely disseminated inside information about Loop to their associates, including one example that Lazerus admitted to when questioned by agents in February 2022.

Third, financial records show the defendants distributing the proceeds of stock sales among themselves, including paying obvious commissions to defendant Lazerus, who acted as an unlicensed broker in violation of the securities laws as described above.

Fourth, Danks and Destler used corporate entities to conceal their beneficial ownership of reportable quantities of LOOP stock.  Danks also used a shell entity named Ventanas Capital, putatively controlled by his close personal associate, to sell a large quantity of Loop stock while serving as a LOOP director—in obvious violation of both securities disclosure requirements and Loop corporate policy.

Fifth, financial records show that Danks, Destler and Lazerus all collaborated in *other* stock deals besides LOOP that involved—at a bare minimum—the intensive use of Lazerus as an unlicensed broker to find large-scale investors who could fund the defendants' joint projects.  Once again, the proceeds from these projects were regularly divided among the three men, as shown from the financial records themselves. Layering

---

[11]    Per the Court's pretrial order, the United States filed notice of its proposed summary charts under Fed. R. Evid. 1006 on June 28, 2024.  ECF 265.

the communications atop the financial records reveals that Danks coordinated and supervised manipulative trading of at least some of these stocks, as well.

Sixth, recorded conversations between Lazerus, Destler and an undercover FBI agent demonstrate one later iteration of the scheme: Lazerus promoting LOOP stock on the strength of inside information, including information received from Destler.

Taken together, the evidence in this case is more than enough to establish the existence of a conspiracy by a preponderance of the evidence. Coconspirator statements should be admitted under Rule 801(d)(2)(E) without the need for any further showing.

3.  Entrapment

Lazerus has indicated he intends to rely on a defense of entrapment based on his interactions with the UCE from 2020 to 2021. A district court is required to give an entrapment instruction if there "exists evidence sufficient for a reasonable jury" to find that the defendant was entrapped. *United States v. Spentz*, 653 F.3d 815, 818 (9th Cir. 2011); *see also United States v. Gurolla*, 333 F.3d 944, 951 (9th Cir. 2003) (holding that only "slight evidence" raising the issue of entrapment is necessary for submission of the issue to the jury (quotations and citation omitted)). Entrapment has two elements: "(1) the defendant was induced to commit the crime by a government agent, and (2) he was not otherwise predisposed to commit the crime." *United States v. Barry*, 814 F.2d 1400, 1401 (9th Cir. 1987). A defendant is not entitled to an entrapment instruction unless there exists sufficient evidence on both elements. *Spentz*, 653 F.3d at 818; *see also United States v. Busby*, 780 F.2d 804, 806 (9th Cir. 1986) ("The trial court will instruct on entrapment only if the defendant presents some evidence of both elements of the entrapment defense."). The defendant has the burden of making a threshold prima facie showing that meets both elements. *United States v. Montoya*, 844 F.3d 63, 66-67 (1st Cir. 2016). "Once that prima facie showing has satisfied the defendant's entry-level burden of production, the government must shoulder the burden of proving beyond a reasonable doubt that entrapment did not occur." *Id.*

In order to satisfy the first element, the defendant must make a showing of inducement, which "consists of an 'opportunity' plus something else—typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive." *See Spentz*, 653 F.3d at 819 (quotation omitted); *Mathews v. United States*, 485 U.S. 58, 63 (1988) ("Predisposition, the principle element in the defense of entrapment, focuses upon whether the defendant was an unwary innocent or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime."); *United States v. Poehlman*, 217 F.3d 692, 697 (9th Cir. 2000) ("Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute."). "[T]he fact that officers or employee of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution." *Jacobson v. United States*, 503 U.S. 540, 548 (1992).

As to the second element, when determining whether a defendant was predisposed to commit the offense, the court considers five factors, including "the character or reputation of the defendant." *United States v. So*, 755 F.2d 1350, 1354 (9th Cir. 1985). Thus, the defendant's character is an essential element of the defense. *United States v. Gomez*, 6 F.4th 992, 1004 (9th Cir. 2021). Prior wrongs are generally considered to be evidence of intent in the context of entrapment. *United States v. Simtob*, 901 F.2d 799, 807 (9th Cir. 1990). As with all evidence, character evidence that is presented for entrapment must comply with the relevance requirements of Rule 402 and Rule 403's prohibition on evidence that is "substantially outweighed by a danger of… unfair prejudice." *See Barry*, 814 F.2d at 1403. In the Ninth Circuit, evidence of prior crimes or wrongs for entrapment are relevant only if they are "similar to the charged crime." *United States v. Mendoza-Prado*, 314 F.3d 1099, 1103 (9th Cir. 2002).

Here, Lazerus will be hard-pressed to meet his initial burden for an entrapment instruction based on his dealings with the UCE from 2020 to 2021. The charged conspiracy in this case spanned from October 2014 to February 2022. According to the indictment,

Lazerus committed overt acts in furtherance of the conspiracy as early as 2016 – years before the UCE even entered the picture. It is entirely uncertain how Lazerus could argue that the government implanted the criminal design in his mind when he had been engaging in the conspiracy (including shilling inside information in exchange for unlawful commissions) years before he even met the UCE.

Moreover, as previewed at the motion *in limine* hearing in this case, the United States anticipates asking the Court's permission to set forth evidence of Lazerus's character and prior acts similar to the charged crime as soon as Lazerus previews a defense of entrapment at trial. The United States anticipates such evidence will overcome Lazerus's defense.

### 4. Hostile Witness or Witness Identified with an Adverse Party

The United States expects to call witnesses that are close friends and associates of the defendants. Based on those close personal relationships, during the testimony of such witnesses, the United States may request permission to conduct its examination using leading questions, as permitted by Rule 611(c) of the Federal Rules of Evidence.

Rule 611(c) provides that "[w]hen a party calls a hostile witness, an adverse party, or a witness identified with an adverse party; interrogation may be by leading question." The Rule "vests broad discretion in trial courts." *Miller v. Fairchild Industries*, 885 F.2d 498, 514 (9th Cir. 1989). Reversal on the basis of an exercise of discretion under the Rule will occur "only if the judge's action amounted to or contributed to the denial of a fair trial." *Id.* "The term 'witness identified with an adverse party' is intended to apply broadly to an identification based upon employment by the party or by virtue of a demonstrated connection to the opposing party." Glen Weissenberger, *Federal Evidence 1996 Courtroom Manual* 134 (1995).

Before the adoption of Rule 611(c), the use of leading questions on direct examination required either a showing of actual hostility or a determination that the witness being examined was an adverse party, or an officer, director, or managing agent of an adverse party. *Ellis v. City of Chicago*, 667 F.2d 606, 612 (7th Cir.1981).  The drafters of the Rule decided that these limitations presented "an unduly narrow concept of those who

may safely be regarded as hostile without further demonstration. Fed. R. Evid.611(c) Advisory Committee Notes. The new rule was thus designed to enlarge the categories of witnesses automatically regarded as adverse, and therefore subject to interrogation by leading questions without further showing of actual hostility." *Id.*

Rule 611(c) also states: "[O]rdinarily leading questions should be permitted on cross-examination." But as the Advisory Committee Notes make clear, the "right of a cross-examiner to employ leading questions is not absolute under Rule 611(c)." *Morvant v. Construction Aggregates Corporation*, 570 F.2d 626, 635, n.12 (6th Cir. 1978). "Generally, when a witness identified with an adverse party is called, the roles of the parties are reversed. Leading questions would be appropriate on direct examination but not on cross examination." *Alpha Display Paging v. Motorola*, 867 F.2d 1168,1171 (8th Cir. 1989). The Advisory Committee Notes to Rule 611(c) state the use of the word "ordinarily" was meant to "furnish a basis for denying the use of leading questions when the cross examination is cross examination in form only and not in fact," giving the example of an insured defendant who proves to be friendly to the plaintiff. In instances where the United States' witnesses are friendlier to the defendants, the United States would request that the Court require the defense to examine these witnesses by means of non-leading questions.

## IV

## WITNESSES

The United States intends to call some or all of the following witnesses in its case-in-chief. It reserves the right to call additional witnesses.

      1.    Michelle Fiore

      2.    David Williams

      3.    Chester Griffiths

      4.    Josif Borovic

      5.    Gary Osterberg

      6.    Kenneth Rogers

7.    Thomas Garvey

8.    Amanda Stewart, FBI Special Agent

9.    Jeremy Tarwater, FBI Special Agent

10.    Jonathan Joyce, FBI Special Agent

11.    Benjamin McDonnell, FBI Forensic Accountant

12.    Peter Melley, FINRA

13.    Gary Brennan

14.    Martha Brennan

15.    Kimberly Brennan

16.    Kevin Brennan

17.    Steve Bajic

18.    Branden Frazier, Creative Planning

19.    Jason Carter, Wilson-Davis & Co., Inc.

20.    Victoria Bogat, Charles Schwab

21.    Mary Smith, Equiniti-AST

# V

# **EXHIBITS**

In accordance with the Court's pretrial scheduling order, the United States disclosed its draft exhibit list to the defendants on July 9, 2024. According to the scheduling order, the defendants are expected to disclose their exhibit lists to the United States on July 23, 2024. The parties expect to reasonably amend their exhibits lists as necessary in the lead-up to trial. In summary, the United States intends to offer evidence related to the following categories of exhibits:

1.    <u>Financial records</u> – bank statements.

2.    <u>Business records</u> – brokerage and transfer agent documents, documents relating to business entities owned or controlled by the defendants, email account records, Loop board minutes agendas, and IP address records.

3. <u>Audio</u> – audio recordings of meetings with undercover agents and telephone calls with Charles Schwab, which will be accompanied by transcripts that have been vetted by the defense.

4. <u>Email, iCloud, and Phone Records</u> – records obtained from the search of defendants' email accounts, iCloud accounts, and cellphones, and from productions of various entities (including the defendants and their entities) to the Securities and Exchange Commission.

5. <u>Summary charts</u> – various charts summarizing voluminous evidence and/or intended to be used as demonstratives.

6. <u>Photographs</u> – a limited number of photographs of various individuals and locations, including a single photograph of the property charged in Count 3.

# VI

# <u>VOIR DIRE</u>

The United States respectfully requests that the following *voir dire* questions be addressed to the jury panel in addition to the Court's standard jury questions:

1. Has anyone invested in the stock market?

2. Does anyone use a stockbroker or investment advisor?

3. Does anyone have strong feelings about stockbrokers or investment advisors?

4. Has anyone worked in the financial industry?  If so, in what capacity?

5. Does anyone have strong feelings about the financial industry or the securities markets?

6. Does anyone have strong feelings about the environment, plastics, and/or recycling?

7. Has anyone had any training in the law?  Please explain.

8. The United States may call at least one witness employed by the Federal Bureau of Investigation.  Does anyone have family members or close friends who work, or have worked, for this agency? Would that prevent you from being fair and impartial? Does anyone have any negative views of this agency that would prevent them from being fair and impartial?

9.     This case is being prosecuted by the local U.S. Attorney's Office, which is part of the Department of Justice. Does anyone have negative views about the Department of Justice that would prevent them from being fair and impartial?

**VII**

**JURY INSTRUCTIONS**

After meeting and conferring, the parties have proposed jury instructions under separate cover. ECF 277, 283, 287, 289. Jury instructions were discussed during the motion *in limine* hearing on July 12, 2024, and limited additional discussions are anticipated on July 30, 2024.

DATED: July 23, 2024.                          TARA K. MCGRATH
                                               United States Attorney

                                               */s/ Janaki G. Chopra*
                                               JANAKI G. CHOPRA
                                               Assistant United States Attorney

                                               */s/ Nicholas W. Pilchak*
                                               NICHOLAS W. PILCHAK
                                               Assistant United States Attorney