Pages 1 - 30

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable Cynthia Bashant, Judge

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
   VS.                         )        NO. 22-CR-02701-BAS
                               )
DONALD DANKS, JONATHAN         )
DESTLER, AND ROBERT LAZERUS,   )
                               )
            Defendants.        )
_____)

San Diego, California
Tuesday, August 6, 2024

**PARTIAL TRANSCRIPT OF JURY TRIAL, DAY 5**

**(CROSS-EXAMINATION OF JEREMY TARWATER BY MR. YOUNG)**

**APPEARANCES:**

For Plaintiff:
                        TARA K. MCGRATH
                        United States Attorney
                        880 Front Street, Room 6293
                        San Diego, California 92101
                BY:  **NICHOLAS W. PILCHAK, ESQ.**
                        **JANAKI GANDHI CHOPRA, ESQ.**
                        **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant Donald Danks:
                        LAW OFFICE OF PATRICK Q. HALL
                        402 West Broadway, Suite 1560
                        San Diego, California 92101
                BY:  **PATRICK Q. HALL, ESQ.**
                        **ATTORNEY AT LAW**


**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:   James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                Official Court Reporter

**APPEARANCES**:   **(CONTINUED)**

For Defendant Jonathan Destler:
                        SNELL & WILMER
                        12230 El Camino Real, Suite 300
                        San Diego, California 92130
            BY:   **ANDREW PHILLIP YOUNG, ESQ.**
                  **ATTORNEY AT LAW**


                        MILLER BARONDESS, LLP
                        2121 Avenue of the Stars, Suite 2600
                        Los Angeles, California 90067
            BY:   **LOUIS "SKIP" MILLER, ESQ.**
                  **ATTORNEY AT LAW**

For Defendant Robert Lazerus:
                        LAW OFFICE OF MARTHA M. HALL
                        555 West Beech Street, Suite 508
                        San Diego, California 92101
            BY:   **MARTHA MCNAB HALL, ESQ.**
                  **ATTORNEY AT LAW**

                        LAW OFFICE OF ADAM F. DOYLE
                        444 West C Street, Suite 310
                        San Diego, California 92101
            BY:   **ADAM F. DOYLE, ESQ.**
                  **ATTORNEY AT LAW**

1

       **I N D E X**

2  Tuesday, August 6, 2024 - Day 5

3  **GOVERNMENT'S WITNESSES**                          **PAGE DAY**

4  **TARWATER, JEREMY (RECALLED)**
   (PREVIOUSLY SWORN)                                      4    5
5  Cross-Examination by Mr. Young                          4    5

6                  **E X H I B I T S**

7  **GOVERNMENT'S EXHIBITS**                    **IDEN  EVID DAY**

8   536                                          12    13   5

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  **Tuesday - August 6, 2024**                                    **2:09 p.m.**

2                          **P R O C E E D I N G S**

3                              **---o0o---**

4          **THE COURT:**  Mr. Young, since you're standing up.

5          **MR. YOUNG:**  Excuse me.

6      I don't know if this is the ideal order we should go in,

7  but --

8                          (Laughter.)

9                      **JEREMY TARWATER**,

10  called as a witness for the Government, having been previously

11  duly sworn, testified further as follows:

12                      **CROSS-EXAMINATION**

13  **BY MR. YOUNG:**

14  **Q.**   Good afternoon, Agent Tarwater.

15  **A.**   Good afternoon, sir.

16  **Q.**   I want to talk a little bit more about Mr. Brennan, start

17  off with.

18      Now, we've cleared -- clearly, you never interviewed

19  Mr. Brennan.  That's not in dispute; correct?

20  **A.**   If you mean Allan Brennan, yes, sir.

21  **Q.**   Allan Brennan.  Thank you.  Allan Brennan.

22      And you attempted to interview him at his house; correct?

23  **A.**   Yes, sir.

24  **Q.**   And subsequent to that, you talked to his son; correct?

25  **A.**   His son and his financial adviser, yes, sir.

1  **Q.**   Right.

2      And you were concerned that, if you went and interviewed

3  Mr. -- Mr. Allan Brennan at that point, Mr. Allan Brennan would

4  go to Robert Lazerus; correct?

5  **A.**   That was definitely a concern, yes.

6  **Q.**   Right.

7      And you can't -- you can't have Mr. Allan Brennan going to

8  Mr. Lazerus and then run an undercover; correct?

9  **A.**   We were worried that Robert Lazerus would coach

10  Allan Brennan, and we wouldn't get reliable information from

11  him.

12  **Q.**   Well, your intent at that point was to run an undercover;

13  correct?

14  **A.**   After we made that determination, the team decided, "Let's

15  try an undercover."

16  **Q.**   All right.  And so part of that undercover is the person

17  that you're running the undercover on can't know that there's

18  an investigation; correct?

19  **A.**   Yes, sir.

20  **Q.**   And you are an experienced undercover agent; correct?

21  **A.**   Yes, sir.

22  **Q.**   And one of the reasons that the person that you're running

23  the undercover on can't know is because -- for safety reasons;

24  correct?

25  **A.**   That is one reason, yes, sir.

TARWATER - CROSS / YOUNG

1 **Q.**  Because you don't know anything about that person at the

2 beginning of an investigation; correct?

3 **A.**  Well, actually, we knew a lot about him at that point, but

4 safety is a concern.

5 **Q.**  Right.

6     And it's also not best practices to run an undercover --

7 to be an undercover in the same place you live; correct?

8 **A.**  That is not the preferred method, no.

9 **Q.**  Right.

10     And the FBI has undercovers throughout the country;

11 correct?

12 **A.**  Yes.

13 **Q.**  And those undercovers are trained and certified, just like

14 you are; correct?

15 **A.**  They are.

16 **Q.**  And they will go to different regions to do their

17 undercover role for that very reason; correct?

18 **A.**  As long as their expertise is applicable to the undercover

19 role.

20 **Q.**  Right.

21     And, nationwide, the FBI has undercovers who are fluent in

22 financial language; correct?

23 **A.**  Not that many, unfortunately, but yes, we do.

24 **Q.**  There are some, though?

25 **A.**  There are some, yes, sir.

1   **Q.**   All right.  So those undercover agents could have come to

2   San Diego and been an undercover in this case?

3   **A.**   Well, they couldn't have because we did a canvass for all

4   undercovers to see if anyone was available who could come from

5   outside the area to do the role, and no one was available.

6   **Q.**   So -- so you had -- you had to do it yourself?  You had to

7   be the undercover yourself because of that?

8   **A.**   The team discussed it and decided I would do the

9   undercover role, yes, sir.

10  **Q.**   But you agree with me it's not best practices to be an

11  undercover in the same location that you live?

12  **A.**   Correct.

13  **Q.**   And it's also not best practices to be an undercover in

14  the same case where you are the lead agent; correct?

15  **A.**   You have to get approval, which we did, but yes, that's

16  not preferred.

17  **Q.**   But you're -- you're trained to be an undercover?

18  **A.**   Yes, sir.

19  **Q.**   And you've been an undercover how many times?

20  **A.**   At least in ten cases.

21  **Q.**   And so you could have approached Allan Brennan in the

22  capacity as an undercover?

23  **A.**   That -- that would have been possible.

24  **Q.**   Right.

25        Just like Gary Brennan introduced you to Robert Lazerus,

1    Gary Brennan could have introduced you to his father?

2    **A.**    He could have.

3    **Q.**    Right.

4        And you could have had a discussion with -- with

5    Mr. Brennan about what Mr. Lazerus told him -- correct? -- in

6    the capacity as an undercover?

7    **A.**    It didn't seem viable, based on what the son had told us

8    and the financial adviser.

9    **Q.**    You agree with me you successfully were introduced to

10    Robert Lazerus?

11    **A.**    Through Gary Brennan, yes, sir.

12    **Q.**    And you dis- -- you disagree with me that you could have

13    been successfully introduced to Mr. Allan Brennan through his

14    son?

15    **A.**    It did not appear that you could go to Allan Brennan and

16    get Allan Brennan to introduce you to Robert Lazerus, based on

17    the relationship between Lazerus and Allan Brennan.

18    **Q.**    But -- my mistake.

19    **A.**    Oh.

20    **Q.**    I think we're talking about --

21    **A.**    Apologies.

22    **Q.**    Okay.  Not to get -- not to have Mr. Allan Brennan

23    introduce you to Mr. Lazerus.  That's not what I'm asking.

24    **A.**    Okay.  I'm sorry.

25    **Q.**    I'm asking you if Mr. Gary Brennan could have introduced

1   you to Mr. Allan Brennan.

2   **A.**   He could have.

3   **Q.**   And you could have had conversations with Allan Brennan

4   about what his relationship was with Mr. Lazerus as an

5   undercover agent; correct?

6   **A.**   We could have, but he wouldn't even talk to his son about

7   it.  So it didn't seem likely he would talk to a stranger about

8   it.

9   **Q.**   But you didn't even try; correct?

10  **A.**   No, we did not try.

11  **Q.**   And if you had tried, he wouldn't have known you were an

12  undercover agent?

13  **A.**   If we had tried, and it was successful, yes.  Right.

14  **Q.**   Now, you were the co- -- colead agent on this case

15  throughout; correct?

16  **A.**   Yes, sir.

17  **Q.**   And that includes up until when this case was indicted in

18  roughly November of 2022; correct?

19  **A.**   Yes, sir.

20  **Q.**   And at the time of that indictment, you were -- believed

21  that Mr. Allan Brennan lost money; correct?

22  **A.**   It's hard to say "lost money" because he still owned

23  shares.  So it would depend on if he could sell his shares in a

24  sufficient amount to make up his cost basis.  So it's a hard

25  question to -- to answer.

1  **Q.**   At the time -- at the time of the indictment, you hadn't

2  calculated whether he had lost money or not?

3  **A.**   That would be the forensic accountant, but I had not

4  personally, no.

5  **Q.**   Okay.  But you work with the forensic accountant?

6  **A.**   Yes, sir.  Yes, sir.

7  **Q.**   And had you had those conversations with the forensic

8  accountant about whether Allan Brennan had lost money?

9  **A.**   We had questions about how much money he put into Loop and

10  other deals.

11  **Q.**   And so it's your -- I'm sorry.  Go ahead.

12  **A.**   Go ahead.

13  **Q.**   So -- and you did -- did you testify in front of -- you

14  did not testify in front of the grand jury?

15  **A.**   No, sir.

16  **Q.**   Do you know who did?

17  **A.**   I can make an educated guess, yes.

18  **Q.**   Was it -- was it David Patterson?

19  **A.**   No, sir.

20  **Q.**   Was it Amanda Stewart?

21  **A.**   No, sir.

22  **Q.**   Was it an agent that worked on this case at all?

23  **A.**   Had some work on the case but not much.

24  **Q.**   Okay.  So the lead case agent, you, did not testify in

25  front of the grand jury?

1  **A.**   Neither of the co- -- the coleads testified in front of

2  the grand jury.  No, sir.

3  **Q.**   Okay.  And Ms. -- Ms. Stewart, who's worked on this case

4  fairly substantially, has not -- did -- was also not testifying

5  in front of the grand jury?

6  **A.**   She had not joined our squad at that point, no.

7  **Q.**   Fair enough.

8       And so some other agent, who you don't know the name of,

9  is the agent that testified in front of the grand jury?

10 **A.**   Well, I can give you the name I think it is.  I just -- if

11 you want an exact name, I would need to refresh my memory.

12 **Q.**   Best guess.

13 **A.**   Todd Townsend.

14 **Q.**   Okay.  Now, did you discuss with Mr. -- oh.  I'm sorry.

15 How do you say his last name?

16 **A.**   Townsend.

17 **Q.**   Townsend?

18 **A.**   Yes, sir.

19 **Q.**   Did you discuss with Mr. Townsend whether Mr. Brennan lost

20 money?

21 **A.**   I did not.

22 **Q.**   Did you know if Mr. Patterson discussed with Mr. Townsend

23 whether Mr. Brennan lost money?

24 **A.**   I don't know.

25 **Q.**   Do you know what Mr. Townsend told the grand jury about

1    Mr. Brennan?

2    **A.**    I do not.

3            **MR. YOUNG:**    Your Honor, if I can grab my computer.

4            **THE COURT:**    Sure.

5            **MR. YOUNG:**    Thank you.

6        (Government's Exhibit 536 marked for identification.)

7    **BY MR. YOUNG:**

8    **Q.**    I'm showing you what's been marked as Government

9    Exhibit 536.

10        Do you see that in front of you?  It's not in evidence.

11    **A.**    Yes, sir.

12    **Q.**    Have you seen this document before?

13    **A.**    I have.

14    **Q.**    And is this a summary of the value of Mr. Allan Brennan's

15    Loop stock on a particular day?

16    **A.**    It's -- it tracks the amount he purchased stock for

17    privately and publicly and then the amount he sold into the

18    open market.  And then there's a number of shares he's still

19    holding and, as of this particular date, what theoretically

20    that would be worth.

21            **MR. YOUNG:**    Your Honor, we offer Government

22    Exhibit 536 into evidence.

23            **THE COURT:**    Any objection?

24            **MS. CHOPRA:**    No, Your Honor.

25            **MR. HALL:**    No objection, Your Honor.

1              **THE COURT:**  536 may be admitted.

2          (Government's Exhibit 536 received in evidence.)

3    **BY MR. YOUNG:**

4    **Q.**   So do you see here -- this is the chart you were just

5    describing; correct?

6    **A.**   Yes, sir.  Yes, sir.

7    **Q.**   And it says, "Allan Brennan and the Brennan Estate" at the

8    top; correct?

9    **A.**   Correct.

10   **Q.**   And that's because, by this point, Mr. Allan Brennan had

11   passed away; correct?

12   **A.**   Yes, sir.

13   **Q.**   Because he had -- he had died on Halloween night of 2021;

14   correct?

15   **A.**   Yes, sir.

16   **Q.**   At the time of his death, he -- the value of the Loop

17   stock was higher than it is reflected on this -- this stock;

18   correct?  Or on this chart; correct?

19   **A.**   I think that's correct.  I'm not positive, though.

20   **Q.**   So from the date he had -- to the best of your

21   recollection, on the date he died, the value of the stock was

22   actually higher?

23   **A.**   I think that's right.

24   **Q.**   But on -- on this date, which is February 3rd, 2022, he

25   had -- prior to that, had bought roughly $8.5 million worth of

1  stock?

2  **A.**    Privately and publicly, yes.

3  **Q.**    All right.  And by that point, he and his family had sold

4  8.9 million; correct?

5  **A.**    The family because he wasn't, unfortunately, around for

6  part of this.  Yes, sir.

7  **Q.**    Okay.  And so, at that point, he's got -- the family

8  estate has approximately $484,000 cash?

9  **A.**    That's what that term says, yes, sir.

10  **Q.**    Right.

11        And he still had another remaining stock that, at the

12  time, was worth 2.2 million and change; correct?

13  **A.**    At whatever the closing price from that date was, yes,

14  sir.

15  **Q.**    And if they had sold on that date, that would have been

16  pure profit because he's already made back his -- what he's

17  bought at that point; correct?

18  **A.**    In Loop, yes.

19  **Q.**    Okay.  And -- and on the bottom, it says there's another

20  124,653 Loop shares remaining at the transfer agent.  Do you

21  see that?

22  **A.**    I do.

23  **Q.**    So -- and that's valued, at that time, at roughly

24  $950,000; correct?

25  **A.**    That date is the closing date, right.

1    **Q.**   Right.

2         And so that would be in addition to the 2.2 million there;

3    correct?

4    **A.**   If you can sell all that stock at that price, yes.

5    **Q.**   Right.

6         And I -- in fairness, if you put it all on the market at

7    once, you wouldn't get that price for it necessarily; correct?

8    **A.**   Correct.

9    **Q.**   All right.  But you would get something for it?

10   **A.**   Yes.

11   **Q.**   And anything that they sell, anything past this point,

12   is -- is profit; correct?

13   **A.**   In Loop, yes, sir.

14   **Q.**   Okay.  Now, at the time that this case was indicted, you

15   don't know if the grand jury was told this; correct?

16   **A.**   I was not in front of the grand jury for this case, no.

17   **Q.**   And so you don't know what the grand jury was told?

18   **A.**   No.

19   **Q.**   Okay.  You'd agree with me that it was implied to the

20   grand jury that he had lost money?

21        **MS. CHOPRA:**  Objection, Your Honor.  Relevance --

22        **THE COURT:**  Sustained --

23        **MS. CHOPRA:**  -- and --

24        **THE COURT:**  -- as to the fact -- he says he doesn't

25   know what was said to the grand jury.  So he can't tell you

1   what was implied to the grand jury, either.

2   **BY MR. YOUNG:**

3   **Q.**   Did you read the indictment?

4   **A.**   After the indictment was returned.

5   **Q.**   And based on the reading of the indictment, does it appear

6   that it was implied to the grand jury that he had lost money?

7              **MS. CHOPRA:**  Same objection, Your Honor.

8              **THE COURT:**  Sustained.

9   **BY MR. YOUNG:**

10  **Q.**   Now, you first learned that Mr. Brennan had made this much

11  money approximately a year after he was indicted; correct?

12  **A.**   A -- a year after --

13  **Q.**   After these defendants were indicted; correct?

14  **A.**   I don't recall dates because records come in over time.

15  So there's always gaps in doing calculations.

16  **Q.**   And Mr. Gary Brennan told you that the family had lost

17  money; correct?

18  **A.**   Yes.

19  **Q.**   And that his -- that was based on his reading of a

20  brokerage statement; correct?

21  **A.**   I don't know what it was based on.

22  **Q.**   Are you familiar with tax basis?

23  **A.**   Yes.

24  **Q.**   Are you familiar that when someone passes away, the tax

25  basis moves up?

1    A.    I'm familiar with -- possible, yeah.

2    Q.    Okay.  Are you -- are you familiar with tax basis as it

3    relates to this case?

4    A.    I'm no expert in tax basis.

5    Q.    Well, did you have any discussions with anybody from the

6    prosecution team about tax basis in this case?

7    A.    I did not.

8    Q.    Okay.  So you weren't aware that it was -- the loss that

9    appears on this brokerage statement was actually a tax loss,

10    not a real loss; correct?

11    A.    I'm not aware either way.

12    Q.    Okay.  Were you -- were you aware that the defense

13    actually pointed that out, for the first time, about a year

14    after this case was indicted?

15    A.    No.

16    Q.    You weren't aware of that?

17    A.    Not at that point, no.

18    Q.    Was it around that time that you became aware that

19    Mr. Brennan and his family had actually made several million

20    dollars in this stock?

21    A.    It was certainly a point in time where I became aware they

22    had made money in the stock.

23    Q.    And that was after the case was indicted; correct?

24    A.    I certainly became aware after, yes.

25    Q.    All right.  So just so we're clear, though, you became

1 aware that Mr. Brennan and his family -- or Mr. Brennan's

2 family, the estate, made money in Loop stock after this case

3 was indicted?

4 A.   I don't know the time period.  I became aware of that fact

5 at some point in time.

6 Q.   Okay.  I just want to bookend it.

7      Did you become aware of it after it was indicted?  That's

8 correct?

9 A.   I can't recall when I became aware of it.

10 Q.   Did you become aware of it before those letters started

11 going out to other Loop investors?

12 A.   That the estate of Allan Brennan had made money in Loop?

13 Q.   Yes.

14 A.   Probably.

15 Q.   All right.  In fact, those letters started to go out to

16 those Loop investors because you learned Mr. Allan --

17 Mr. Allan Brennan and his family had made money in Loop; isn't

18 that correct?

19 A.   No.  It was -- letters always go out to potential victims.

20 Q.   Would you agree with me that the letter went out after you

21 learned that Mr. Brennan had made money in Loop?

22 A.   Not -- not like we became aware and the letters went out,

23 but we became aware, and sometime later the letters went out.

24 Q.   Okay.  Now, you -- as part of your training as an FBI

25 agent, you're trained how to interview witnesses; correct?

1  **A.**    Yes, sir.

2  **Q.**    And it's important that -- you learned that first in

3  Quantico; correct?

4  **A.**    Correct.

5  **Q.**    You have additional training on it; correct?

6  **A.**    Yes.

7  **Q.**    It's one of the most important parts of your job; isn't

8  that correct?

9  **A.**    Yes.

10  **Q.**    Is to interview a witness and just get the objective

11  facts; isn't that true?

12  **A.**    Well, get -- get the information they provide, and

13  hopefully it's accurate and timely and relevant, yeah.

14  **Q.**    And it's important not to taint those witnesses ahead of

15  time; correct?

16  **A.**    We hope to get accurate, timely, relevant information.

17  **Q.**    I was -- I was asking just a slightly different question.

18      It's important not to taint those witnesses with facts

19  that may be unaware -- unaware to them; correct?

20  **A.**    I mean, we don't want to taint a witness, you know?

21  **Q.**    Right.

22      So I think we're in agreement.  You don't want to taint a

23  witness's memory; correct?

24  **A.**    Sure.

25  **Q.**    Right.

1    You don't want to sort of subconsciously put ideas in

2    their head before you've started to interview them; correct?

3    **A.**    Well, we challenge them.  We give them information

4    sometimes, but we don't want to taint their memory of things.

5    **Q.**    Okay.  And -- and you -- is it best practices to send a

6    press release along with a letter asking somebody if they're a

7    victim?

8    **A.**    Sending a public press release is -- I don't think there's

9    an issue with that.

10    **Q.**    Well, let's unpack that.

11    You have a -- the FBI has a database -- correct? -- of

12    people and where they live?

13    **A.**    We have access to databases, yes.

14    **Q.**    Right.

15    It's fairly easy for an FBI agent to figure out where

16    somebody lives; correct?

17    **A.**    Not always, but usually.

18    **Q.**    Relatively easy?

19    **A.**    Yeah.

20    **Q.**    Unless they're trying to hide?

21    **A.**    Or it's a common name, and you don't have any other

22    information.

23    **Q.**    And you have FBI agents all over the country; correct?

24    **A.**    We do.

25    **Q.**    And -- and field offices send requests out to other field

1    offices all the time saying, "Hey, can you go interview this

2    person so I don't have to fly from San Diego to Orlando,

3    Florida?"  Correct?

4    **A.**    Yes, sir.

5    **Q.**    And you tell those agents what to go ask, and then they go

6    to the house, and they try to interview those witnesses;

7    correct?

8    **A.**    That's one way to do it, yes, sir.

9    **Q.**    And you don't need to send a letter ahead of time to set

10   up that interview, do you?

11   **A.**    No, not to set up an interview.

12   **Q.**    Right.

13        But before you -- you confronted Mr. Lazerus, and you

14   revealed yourself not as an undercover agent but as yourself,

15   you didn't send him a letter ahead of time, did you --

16   **A.**    No.

17   **Q.**    -- to let him know you were coming?

18   **A.**    No.

19   **Q.**    And when you went to go talk to Mr. Allan Brennan and

20   failed, you didn't send him a letter to let him know that you

21   were coming; correct?

22   **A.**    Correct.

23   **Q.**    And so, in this instance, however, with these "victims,"

24   quote/unquote, you did send a letter at that time?

25   **A.**    It's different in this kind of scheme.

| | |
|---|---|
| 1 | **Q.**   I'm just asking if you sent a letter ahead of time. |
| 2 | **A.**   At some point in time, we did send a letter, yes. |
| 3 | **Q.**   Right. |
| 4 |      And that was before you made any attempt to interview any |
| 5 | of these people? |
| 6 | **A.**   No, that's not accurate.  We called many people before |
| 7 | that. |
| 8 | **Q.**   You attempted to call people before that? |
| 9 | **A.**   Yeah, based on the trading records and the stock. |
| 10 | **Q.**   All right.  And so -- have we gotten all those records? |
| 11 | You've given all those records of calls that you tried to make |
| 12 | to the prosecution? |
| 13 | **A.**   If we reached someone, and they gave an interview, yes. |
| 14 | **Q.**   Now, you got responses back from -- from some of these |
| 15 | people from the letters; correct? |
| 16 | **A.**   Yes. |
| 17 | **Q.**   And some of those -- those responses back were |
| 18 | essentially, "We weren't victims.  This isn't a fraud"; isn't |
| 19 | that correct? |
| 20 |      **MS. CHOPRA:**  Objection, Your Honor.  Hearsay. |
| 21 |      **THE COURT:**  Sustained. |
| 22 | **BY MR. YOUNG:** |
| 23 | **Q.**   Every response that you got from these letters -- did you |
| 24 | provide them to the prosecutors? |
| 25 | **A.**   I wasn't handling this back-and-forth.  So I'd be |

1    speculating.

2    **Q.**    Who was handling it?

3    **A.**    David Patterson and Amanda Stewart, but I have a general

4    awareness, obviously.

5    **Q.**    And you're their -- you're their supervisor; correct?

6    **A.**    I am, yeah.

7    **Q.**    All right.  I want to turn briefly to this notion of

8    inside information.

9          You are a lawyer; correct?

10   **A.**    Yes, sir.

11   **Q.**    And you worked for Latham & Watkins right out of law

12   school; correct?

13   **A.**    I did.

14   **Q.**    Very prestigious law firm; correct?

15   **A.**    It's a big law firm, yeah.

16   **Q.**    It's prestigious.  Don't worry.

17                          (Laughter.)

18   **BY MR. YOUNG:**

19   **Q.**    I don't work there.

20          And you're a securities lawyer; correct?

21   **A.**    I was, yes, sir.

22   **Q.**    And after that, you went to the FBI, and you were

23   eventually a securities white-collar FBI agent; correct?

24   **A.**    Yes, sir.

25   **Q.**    And so you've been investigating securities violations

 1  for -- or dealing with securities and securities violations for

 2  20 years?

 3  **A.**    More, but yes.  Yeah.

 4  **Q.**    And are you aware of the fair disclosure regulations?

 5  **A.**    Yes.

 6  **Q.**    And those regulations are on companies; correct?

 7  **A.**    Yes.

 8  **Q.**    And they're promulgated by the SEC; correct?

 9  **A.**    Correct.

10  **Q.**    And it states that if a company provides nonpublic

11  material information to an entity or person, they have to

12  disclose it to everybody else; correct?

13  **A.**    Correct.

14  **Q.**    But that regulation is on the company --

15  **A.**    Yes.

16  **Q.**    -- correct?

17  **A.**    Yes.

18  **Q.**    It's not on people?

19  **A.**    Reg FD is the company.  That's my memory.  I haven't

20  looked at it in 18 years, but yeah.

21  **Q.**    Okay.  And it's a civil regulation; correct?

22  **A.**    Reg FD?  Yes.

23  **Q.**    Right.

24       There's no criminal sanctions that come -- come along with

25  violating that regulation; isn't that correct?

1   **A.**   Not that I'm aware of.

2   **Q.**   Right.

3        And so the --

4   **A.**   At least not that we've ever charged, you know?

5   **Q.**   You have charged insider trade; correct?

6   **A.**   Yes.

7   **Q.**   And that requires somebody to trade on inside information;

8   isn't that correct?

9   **A.**   Or withhold trading because they know an event's coming.

10  So avoiding some loss is another theory.

11  **Q.**   So that -- you use that information --

12  **A.**   But, yes, it's to trade --

13  **Q.**   -- to trade on it?

14  **A.**   Yes.

15  **Q.**   Or get somebody else to trade on it?

16  **A.**   Yes.

17  **Q.**   And this is not an insider trading case, is it?

18  **A.**   Do you want me to characterize --

19  **Q.**   Is it charged, or is -- is this case -- insider -- insider

20  trading is a specific statute; correct?

21  **A.**   I mean, there's -- I don't understand it to be charged as

22  an insider trading case.

23  **Q.**   And you have access to every trade that any of these three

24  gentlemen ever made; correct?

25  **A.**   That they ever made?  No.

1  **Q.**   That they ever made in Loop?

2  **A.**   No, because if they made -- if trades were made in

3  names -- in other names, that might obfuscate who was actually

4  directing the trading.  But in their names, yes, sir.

5  **Q.**   All right.  Well, we'll get to that tomorrow.

6      The -- I want to show you this chart that's already in

7  evidence.  It's Exhibit 754.

8      Do you recall when this chart -- this came up?

9  **A.**   I do, yes, sir.

10 **Q.**   And this was in the context of the SK Group discussion

11 that you had with Mr. Lazerus; correct?

12 **A.**   That's the context where I was shown this chart, yes.

13 **Q.**   Okay.  And this chart was put up.  I believe it showed a

14 massive volume that was in June of 2021; isn't that correct?

15 **A.**   There's certainly volumes back there, yes, sir.

16 **Q.**   Right.

17      And you -- you invest- -- you spent two to three years

18 investigating these three gentlemen; correct?

19 **A.**   About a year and a half at this point.

20 **Q.**   And as part of that investigation, did you find that they

21 had any connection to anyone in South Korea?

22 **A.**   You're talking about the defendants?

23 **Q.**   Yes.

24 **A.**   Did I find that they had any connection to anyone in

25 South Korea?

1    **Q.**    Right.

2    **A.**    Not that I can recall.

3            **MR. YOUNG:**  Can you take this down for me?

4    **BY MR. YOUNG:**

5    **Q.**    Now, SK Global Group is a South Korean company; correct?

6    **A.**    That's my understanding, yes, sir.

7    **Q.**    And you did a thorough investigation here; correct?

8    **A.**    We -- we did a thorough investigation, I hope, yeah.

9    **Q.**    You looked at the blue sheets?

10    **A.**    Yes, we did.

11    **Q.**    And those blue sheets reflect all the trades in this

12    company; correct?

13    **A.**    In Loop?

14    **Q.**    Yes.

15    **A.**    They should as long as the brokerage is complying with its

16    obligation to submit the orders, yeah.

17    **Q.**    And as part of that investigation, are you aware of

18    massive trading occurring out of entities in South Korea

19    leading up to this announcement?

20    **A.**    I'm aware there was a market surveillance report that

21    looked like there might have been trading ahead of this

22    announcement that was provided by Thera.

23    **Q.**    And that trading was coming out of South Korea; correct?

24    **A.**    I recall at least one account that came out of

25    South Korea.

1    Q.   Are you familiar with the account -- and I apologize for

2    my pronunciation here -- Yuantaret?

3         THE COURT:  Can you spell it?

4         MR. YOUNG:  Y-u-a-n-t-a-r-e-t.

5         THE WITNESS:  I don't recall the name.  I just

6    remember reviewing a report and seeing at least one name from

7    South Korea.

8    BY MR. YOUNG:

9    Q.   And are you familiar with Shinhan, S-h-i-n-h-a-n?

10   A.   Not offhand, no.

11   Q.   Are you familiar with Samsung Securities?

12   A.   In connection with trading here?  I would need my memory

13   refreshed.

14   Q.   Are you familiar with Hyundai Securities?

15   A.   I would need my memory refreshed.

16   Q.   Are you familiar with Hanwha, H-a-n-w-a- -- -h-a?

17   A.   Same answer.

18   Q.   So if there was a chart that -- if you superimposed it

19   over the chart we just looked at, Exhibit 754, that reflected

20   equity -- sorry -- reflected trading activities out of

21   South Korea, would that surprise you?

22   A.   I'm not sure I'm following your question.  I'm sorry.

23   Q.   So if you were shown a chart that showed massive -- the

24   volumes that matched the same chart that the Government

25   presented earlier in 754, but it was exclusively coming out of

1   South Korea, would that surprise you?

2   **A.**   That there was increased volume out of South Korea around

3   the same time?  No, that wouldn't surprise me because if people

4   saw the news in South Korea, and they're following SK Global,

5   they might say, "Well, this is exciting news.  Let me buy the

6   stock."

7   **Q.**   Perhaps -- perhaps I misspoke.

8        Trading that precedes the announcement --

9   **A.**   Ah.

10  **Q.**   -- of this deal between SK Group -- well, SK Group and

11  Loop.  Would that surprise you?

12  **A.**   It wouldn't surprise me because I saw a report saying

13  there was some trading before the announcement.

14       **MR. YOUNG:**  Your Honor, would you like me to keep

15  going or --

16       **THE COURT:**  We can take our recess now.

17       Ladies and gentlemen, we'll recess until 8:30 tomorrow.

18       I just want to remind you -- because I know it's tempting

19  sometimes, when you listen to testimony, to think, "Oh, well,

20  maybe I'll look up something about this.  I'll look up the

21  trading or how this" -- "how trades work, stock terms online,

22  look about" -- "look up about Loop, look up about some of the

23  entities we've heard about."

24       I am ordering that you not do that.  Don't look up

25  anything to do with this case, anything to do with stock

1    trading.  Don't discuss it with anyone, and we will see you

2    tomorrow morning at 8:30.

3                      (End of partial transcript.)

1

2

3                        **CERTIFICATE OF REPORTER**

4           I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Wednesday, August 7, 2024

8

9

10

11                        /S/ James C. Pence-Aviles

12         James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                        U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25