1                    UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

  UNITED STATES OF AMERICA,        )  Case No. 22-cr-2701-BAS
4                                   )
                       Plaintiff,   )  Thursday, August 1, 2024
5        vs.                        )
                                    )  Excerpts of Trial Testimony
6  DONALD DANKS, JONATHAN DESTLER,  )  of Steve Bajic
   and ROBERT LAZERUS,              )
7                                   )
                       Defendants.  )
8  _____ )

9

10

11                REPORTER'S TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE CYNTHIA A. BASHANT
12                 UNITED STATES DISTRICT JUDGE

                        PAGES 1 - 34
13

14

15

16                   (APPEARANCES ON PAGE 2)

17

18

19

20

21  REPORTED BY:

22  ANNE MARIE ROLDAN, RMR, CRR, CSR 13095
    U.S. OFFICIAL COURT REPORTER
23  U.S. District Court Clerk's Office
    333 West Broadway, Suite 420
24  San Diego, California  92101

25  Reported stenographically; transcribed with CAT software.

```
1    APPEARANCES:

2    FOR THE PLAINTIFF:        UNITED STATES ATTORNEY'S OFFICE
                               880 Front Street, Suite 6293
3                              San Diego, California  92101
                               By:  JANAKI G. CHOPRA, AUSA
4                                   NICHOLAS W. PILCHAK, AUSA

5    FOR DEFENDANT             LAW OFFICES OF PATRICK Q. HALL
     DONALD DANKS:             501 West Broadway, Suite 730
6                              San Diego, California  92101
                               By:  PATRICK Q. HALL, ESQ.
7
     FOR DEFENDANT             SNELL & WILMER
8    JONATHAN DESTLER:         12230 El Camino Real, Suite 300
                               San Diego, California  92130
9                              By:  ANDREW P. YOUNG, ESQ.

10                             MILLER BARONDESS, LLP
                               2121 Avenue of the Stars, Suite 2600
11                             Los Angeles, California  90067
                               By:  LOUIS "SKIP" MILLER, ESQ.
12
     FOR DEFENDANT             LAW OFFICE OF MARTHA M. HALL
13   ROBERT LAZERUS:           555 West Beech Street, Suite 508
                               San Diego, California  92101
14                             By:  MARTHA M. HALL, ESQ.

15                             LAW OFFICE OF ADAM F. DOYLE
                               444 West C Street, Suite 310
16                             San Diego, California  92101
                               By:  ADAM F. DOYLE, ESQ.

17

18

19

20

21

22

23

24

25
```

<u>***MONDAY, OCTOBER 28, 2024, 10:00 A.M.***</u>

**\*\*\***

    ***THE CLERK:***  Calling Matter No. 7, 22-cr-2701, United States of America vs. Donald Danks, Jonathan Destler, and Robert Lazerus, on calendar for motion hearing.

    ***MS. CHOPRA:***  Good morning, your Honor.  Janaki Chopra and Nicholas Pilchak for the United States.

    ***THE COURT:***  Good morning.

    ***MR. HALL:***  Patrick Hall for Mr. Danks.

    ***MR. MILLER:***  Skip Miller and Andrew Young for Mr. Destler, who is present.

    ***THE COURT:***  Good morning.

    ***MS. HALL:***  Martha Hall and Adam Doyle on behalf of Mr. Lazerus.

    ***THE COURT:***  I've read everyone's papers.  I'd like to have a little bit of discussion and tell you where I'm at.

    First of all, I'd like to see if it's possible to have a legal -- kind of lay out the legal framework without using the term "pump-and-dump."  And I think part of the reason I'd like to do that is I think it's a very unclear definition, and it confuses the issues.

    So talking about the legal issues, I want to see if we can get on the same page before we talk about the facts of the case.  And I want to start with the Government and make sure we're on the same page.

1        It's not illegal to promote stock.  Even if you say,

2  "Let's get stock up to this price," or "Let's see if we can get

3  A.B. to buy this much stock this week and this much next week.

4        If you don't have an ownership interest in the stock,

5  if you don't stand to profit from the sale, if you're not using

6  insider information, let's say you're only doing it to get it

7  listed on the NASDAQ, or let's say you just really believe in

8  the stock or you're trying to help a friend.  None of that is

9  illegal.

10        Would you agree with that?

11        **MS. CHOPRA:**  On its face, yes, your Honor.

12        **THE COURT:**  Okay.  So moving to the next step.

13        So even if you do have an ownership interest in the

14  company, let's say Mr. Pilchak owns 100 percent of the company,

15  and everyone knows it, and he says, "Buy stock in my company,"

16  or he says, "Ms. Janaki, see if you can get A.B. to buy more

17  stock in my company," and A.B. knows that you're promoting on

18  behalf of Mr. Pilchak and that you're trying to get him to buy

19  the stock.  That's not illegal.

20        Would you agree with that as well?

21        **MS. CHOPRA:**  Yes, your Honor.

22        **THE COURT:**  Okay.  So what's really illegal, as far as

23  I can tell when I was trying to boil this down, is either hiding

24  your ownership interest somehow or using insider information

25  that others don't know you're using to kind of promote the

1    company.

2            Is that sort of what you would agree with?

3        **MS. CHOPRA:**  Both of those.  And on top of that, any of

4    the manipulative techniques?

5        **THE COURT:**  But the idea of those manipulative

6    techniques is that you're hiding it somehow from the other side.

7    I mean, isn't that really the gist of this, is that you're

8    hiding what you're doing?

9        **MS. CHOPRA:**  Part of it -- I think there's different

10   kinds of hiding.  So for example, there's the part of not

11   disclosing the number of shares you have.  That's hiding from

12   the market and from investors.

13           And then there's the techniques, which is trying to

14   artificially affect the market itself.  So it could be a type of

15   hiding -- it's a deception on the market.  Those are two

16   separate kinds of hiding, I guess.

17       **THE COURT:**  Okay.  And let's talk about a reverse

18   merger.  A reverse merger is not illegal even if the shell

19   company that you're using has a nefarious past.  What's illegal

20   is planning this reverse merger to, again, hide the ownership

21   issue.

22           Hiding is kind of the key here.  Would you agree?

23       **MS. CHOPRA:**  That's right with the reverse merger.  The

24   merger itself can be legal.  Even, technically, if a small group

25   of people wanted to control the shares, that could be legal if

1   they disclosed it properly.

2           The point here we wanted to put forward to the Court

3   and the jury was that they did not disclose properly.  So it is

4   a type of hiding, too.

5           **THE COURT:**  So without discussing the facts, does

6   Defense agree so far with what I have been saying as far as -- I

7   mean, the key is hiding.

8           Would you agree, Mr. Hall?

9           **MR. HALL:**  I would, your Honor.

10          **MR. MILLER:**  Yes, your Honor.  We agree.

11          **MS. HALL:**  I think it's hiding-plus.  And that's

12  *Simonelli*, the U.S. Supreme Court case just out from 2023.  It's

13  hiding to defraud.

14          And the Court in *Simonelli* reversed the conviction

15  because they said that there was no proof that they were trying

16  to take money or property to defraud.  To use deception, that's

17  the hiding part, to obtain money from another person.  So that's

18  the second part.

19          **THE COURT:**  Okay.  So let me tell you the problems I

20  have with the Government's case, and then we can talk about --

21  I'd like to talk about each individual defendant separately,

22  because I think they're very differently situated.  And we can

23  kind of talk about what you have against each one.

24          The problem I have is I understand the Government is

25  trying to make this a big scheme.  And I think they just don't

1  have the evidence.  They fall short of showing that it all ties

2  together.

3       And so instead, we're kind of looking at different

4  pieces and saying, you know, this kind of seems like we're

5  moving in the direction of securities fraud, and this kind of

6  looks like -- but I really don't see -- you pull a lot of

7  different individual facts and then try and tie them into a big

8  scheme.

9       And I know that the individual facts are, on their

10 face, somewhat fishy.  They look suspicious.  But I'm not sure

11 that you're able to tie it all into a big scheme, particularly

12 when you're talking each -- about each defendant individually.

13      So let's talk about the facts starting with

14 Mr. Lazerus.  I mean, I think your first three parts of the

15 conspiracy -- the reverse merger, putting Danks on the board to

16 get insider information, and concealing control of the

17 company -- I'm not really sure there's any evidence to tie

18 Mr. Lazerus to that.  I think he kind of comes in at the tail

19 end.

20      And your argument is he formed the team that helped

21 pump up the stock prices.  And I have to tell you I don't find

22 very convincing the arguments with respect to Mr. Lazerus of

23 laddering or -- or the match trades.  I don't think that

24 evidence is very strong.  So that's sort of where -- let's talk

25 about Mr. Lazerus first.

1        **MR. PILCHAK:**  Sure.  If the Court would indulge us, we

2    did sort of split up the -- we'd like to tag team, with the

3    Court's permission.

4        **THE COURT:**  That's fine.

5        **MR. PILCHAK:**  As to Mr. Lazerus, the first thing I will

6    say, the first thing about whether he was involved in the early

7    phases of the charged conspiracy, is he himself took credit for

8    that in some ways, which is when he was speaking with the

9    undercover agent, Agent Tarwater.  He said, "I was there at the

10    beginning we arranged its financing.  We engineered the

11    product."

12        Some of that might have been puffery on his side, but

13    that is what he put toward in his initial meetings with Agent

14    Tarwater, is "I was there at the beginning."

15        Do we have his fingerprints on the email where they're

16    setting up what Mr. Destler describes as "the cap table" and

17    what we say is the plan to take control and arrange all the

18    shares pursuant to the scheme?  No.  That's what he told Agent

19    Tarwater when he was first meeting with him.

20        Then when the FBI went overt and interviewed

21    Mr. Lazerus, he said it was the plan to take control of the

22    stock, to keep it tight, to sell shares judicially, which is to

23    say not to affect the price but to leak shares out into the

24    market in a way where we can keep the price up.

25        So he seems to be fully versed in the scheme when he

1    was telling Agent Tarwater what he participated in.  So in his

2    own words, I think the jury heard evidence from which they could

3    conclude he was a participant early enough on, even if he wasn't

4    the brains of the operation like Mr. Danks and Mr. Destler was.

5              **THE COURT:**  Okay.  Anything else on Mr. Lazerus?

6          **MR. PILCHAK:**  Well, your Honor, I think, you know, with

7    respect to the trades that the Court has identified some

8    concerns about, and whether they are or not manipulative, I

9    understand the Defense point, for example, that those trades

10   didn't happen hundreds of times over the seven-year conspiracy.

11         But I do think that they're indicative of intent.  And

12   if you focus on the laddering chart, for example, I don't think

13   the Court has to really strain itself to understand what

14   Mr. Lazerus was trying to do there.  Because he said in his text

15   message to Mr. Danks, "This price is taking a dive for this Loop

16   stock.  Would it help if I positioned orders anywhere?"

17         So he is telling Mr. Danks not "It's a buying

18   opportunity, I'm interested in getting into the stock, I want to

19   invest because I believe in Loop."  He is making a series of

20   buys to try to price slide around, and then he does turn the

21   price slide around.

22         So did we present evidence to the jury of that

23   happening hundreds of times?  We did not.  But you can see what

24   Mr. Lazerus's intent was in trading with Loop stock in

25   conjunction with Mr. Danks on that day.

1    And, your Honor knows, in white collar cases where

2    there are sophisticated and clever defendants, they often will

3    not text each other, "Let's engage in a securities fraud."  They

4    will text each other, "Here's what we're going to do," in terms

5    of real conduct.  And we have to argue to the jury, You can

6    infer from that that there was a wrongful purpose and not a

7    legitimate investment purpose.  And that is the thrust of our

8    arguments based on the defense.

9        **THE COURT:**  Let me hear from Mr. Lazerus's counsel.

10        And I can tell you that I don't think you're going to

11   get very far with arguing that as a matter of law, there was

12   entrapment.  I mean, I think that's something that would have to

13   go to the jury.  So I'm more interested in whether the

14   Government has actually proven that there was the securities

15   fraud against Mr. Lazerus.

16       **MS. HALL:**  Yes, your Honor.  And I will address the

17   ladder first, because I think the ladder is completely

18   misleading.

19       First of all, it's a limit buy order.  It's not a

20   trade.  It doesn't even show up on the market.  So there's no

21   ability for the limit buy order by itself to impact the market.

22   So to say that he turns around the price, there is no evidence,

23   and there could be no evidence of that purely from a limit buy

24   order.

25       We have case law saying that a limit buy order is

actually inconsistent with manipulative trading, because you are trying to pump up the stock -- sorry -- trying to artificially increase the stock.  Because when you put in a limit buy order, you're saying there's a limit to what I'm willing to pay for this stock.

And if you're trying to artificially increase the price of the stock, there would be no limit to what you're willing to pay for the stock.

**THE COURT:**  So what about the argument that that shows his intent, "Hey, would it help if I pushed the position of the stock?  Would it help if I bought in to inflate the price?"

**MS. HALL:**  That merely shows his intent to support the stock.  We had testimony which was unrebutted by the Government that it's very common for the people who are close investors in a stock, who believe in the stock, to support the stock.

And in fact, you know, Mr. Weintraub said every public company he has, if they're having trouble, the people, the owners of the company will reach out to the known investors to say, "Hey, can you help support the stock?"

So that -- that text message does not show an intent to defraud.  It doesn't show an intent to artificially inflate it. It shows an intent to support a stock that's under attack.

On the match trade, I really don't think much needs to be said given the chart of Ms. Kowalewski, which shows that of the many, many shares that Mr. Lazerus was selling today, only a

1  very small portion of those actually were purchased by

2  Mr. Danks.

3         And there's -- despite the Government's best effort,

4  there's no communication between Mr. Danks and Mr. Lazerus about

5  buying and selling.  And this argument that they were hiding

6  from the text messages, I think that Mr. Danks didn't hide

7  anything from his text messages.  We have lots of text messages

8  from Mr. Danks saying all sorts of things.  So I don't think

9  that that is a cogent or reliable argument.

10        And finally, we have, from the testimony of their own

11 expert, that laddering only matters when it's matched.  In other

12 words, their expert said manipulative trading is trading that is

13 outside the normal forces of the market.  And to bring it

14 outside of the normal forces of the market, you need that match.

15        So what you do to have this fictitious -- fictitious

16 trading, trading that's not on the open market, is you arrange

17 to have both sides of that trade controlled so that the price

18 can be controlled, so that the price is not determined by the

19 market.

20        And even in their laddering, you know, attempt to show

21 manipulative trading, they had no match.  So it was -- whether

22 or not the trade was made was determined by the open market, by

23 the free market.

24        **MR. PILCHAK:**  Your Honor --

25        **MS. HALL:**  So that quite simply doesn't -- doesn't show

1    any manipulative trading.

2         **THE COURT:**  Okay.  Anything further on Mr. Lazerus?

3    And then I'll let the Government respond.

4         **MS. HALL:**  If the Court has any questions about the

5    entrapment period, I'm happy to discuss that.  But otherwise --

6         **THE COURT:**  No.  I think I'm aware of what the issues

7    are.  I'm just not sure it's a Rule 29 issue.

8         **MS. HALL:**  Let me just say this, that the conduct

9    during the entrapment period, if you consider it, it's not a

10   manipulative trading conduct the same as the Government is

11   purporting to argue throughout the preceding years.

12         What we have in the entrapment period is the agent

13   trying to get inside information.  We have the agent trying to

14   get an insider trade.  But that's not what's charged here,

15   insider trading.

16         And we don't have any evidence of Mr. Lazerus, you

17   know, trying to structure these manipulative trades in order to

18   inflate the price of Loop, which is the Government's charge and

19   the Government's theory.

20         **THE COURT:**  Okay.  Anything further with respect to

21   Mr. Lazerus?

22         **MR. PILCHAK:**  Just on the entrapment point, your Honor.

23   I think this is the first trial I've had where the defense is

24   claiming that the defendant was entrapped into committing a

25   crime he wasn't charged with, if the thrust of it on the defense

1  side is the insider trading.  I mean, they are correct that

2  nobody is charged with insider trading.  It is a manner and

3  means of the charged conspiracy, though.

4         As to the argument that I was trying to mislead the

5  Court, Mr. McDonnell testified that most of those orders were

6  filled.  I think Ms. Hall pointed out we didn't put the

7  underlying transaction records in evidence, which, of course, is

8  true.

9         But there was witness testimony from which the jury

10  could conclude that those weren't just buy orders fired off into

11  the air that resulted in nothing but that many of those

12  transactions were filled, and then they could see the price of

13  the stock turning around.

14         Last, as to this concept that there was nothing

15  nefarious about those orders because they were filled in the

16  open market, I want to provide a little more context to what we

17  said at the beginning of the hearing.  I don't know that it's

18  entirely ripe as a legal matter to say telling someone to buy a

19  stock at a specific price at a specific volume on a specific

20  date just for the purposes of affecting the price of the stock

21  can never be stock fraud.

22         And one of the things I want to point the Court to is

23  when Mr. Weintraub, the defense expert, was on the stand and we

24  showed him the text messages from Mr. Danks to Mr. Lazerus where

25  Danks said, "See if you can get Allen in the market for 4- to

1    5,000 shares for the next couple of days.  We need this price to

2    firm up at 13," when Mr. Danks admitted that was solely to get

3    the price up because they had a warrant offering for a stock

4    issue at the same time and basically said it was just about

5    moving the stock price, not because of any fundamental

6    investment reason.

7           Mr. Weintraub's testimony was, "I'm not sure I'd advise

8    my clients to do that, as a securities lawyer."  So I think

9    there is evidence, for example, from which the jury could

10   conclude, I think that was artificial trading.

11          Mr. Danks can testify to the jury, "I wasn't trying to,

12   you know, engage in any wrongful purpose conduct.  I was just

13   trying to help the company," and then the jury could credit it

14   or not.  But on a Rule 29, I don't think that's the Court's

15   function.

16          **THE COURT:**  Okay.  Let's talk next about Mr. Destler.

17          Honestly, I've got to say I think the evidence against

18   Mr. Destler is pretty thin.  There may have been something

19   nefarious going on.  You know, I think you've got the Touchstone

20   transferring, you're arguing, okay, it doesn't look good to move

21   them all to a holding company.

22          I think really the only evidence that I see against

23   Mr. Destler is this lying on the brokerage statement.  And I

24   understand the defense is saying it wasn't a lie, and he really

25   owned less than 5 percent.  But I'm more concerned about --

1  assume that he did own more than 5 percent.  Who is this lying

2  to?  And who is this getting published to?  And how is this

3  evidence that he was somehow -- you know, that's what I'm

4  concerned about.

5          But can you also talk about, just in general, what

6  evidence I seem to be missing with respect to Mr. Destler,

7  because I'm not seeing a lot against Mr. Destler.

8          **MR. PILCHAK:**  Sure.  So I would readily concede that

9  Mr. Destler, for example, was much more careful than Mr. Danks.

10  And again in the context of white-collar offenders, it's common

11  to see people who structure their affairs to avoid creating the

12  evidence of the kind the Court and the jury, I'm sure --

13          **THE COURT:**  That may all be true, but you can't argue

14  that the evidence I've got against this defendant is that he

15  didn't say anything.

16          **MR. PILCHAK:**  Of course not, your Honor.  However, I

17  would point out that Mr. Destler sent a number of communications

18  that we saw during the trial saying "Stop writing things down."

19  He would tell Dr. Griffiths, who was very effusive on text

20  messages, "You need to stop texting like a college girl."

21          I'm not asking the Court to speculate about evidence

22  that's not there.  What I'm saying is you can take those

23  communications and hold them up against the real conduct that

24  Mr. Destler did engage in, which included not just one form to

25  Wilson-Davis where there are some, you know, math errors, as the

1    defense would portray them.  But also, for example, that he lied

2    to his attorney, David Hunt, who was here during trial, about

3    Mr. Danks's affiliation with Touchstone.

4         And I understand the defense has their entire defense

5    about there was a strict separation on the legal side between

6    these two gentlemen as to Touchstone.  And I'm happy to delve

7    more into that, if the Court will permit me, about why I think

8    the evidence is totally inconsistent with that.

9         I think that's a live, ripe issue for the jury where

10   they could say these gentleman do seem to have been functioning

11   as general partners and then hiding behind the legal formalities

12   if anyone tried to shine a light on what they were doing.

13        But I think Mr. Destler also lied to the attorneys in

14   order to get opinion letters so that he could deposit and then

15   trade his Loop stock.  And we've cited some case law in our

16   briefing that that is sufficient as securities fraud.

17        I understand, you know, the garden variety general

18   background principles of fraud are "I lie to someone, and they

19   give me their money."  And that's the simplest case.

20        In the much more complex environment of securities

21   fraud, though, the courts have regularly said that in the

22   context of a scheme where the goal of the scheme is to conceal

23   control from the market, if you lie to these gatekeepers along

24   the way -- like transfer agents or opinion-writing attorneys or

25   brokerages where you'd deposit and trade the shares -- as part

1    of your scheme, that can be securities fraud, even if the

2    Wilson-Davis paperwork doesn't go to the public, even if David

3    Hunt's opinion letter is never put on EDGAR so the public can

4    see it.

5            And one of the ways in which that then affects the

6    market and the public, making it part of a fraud, is that it

7    enables people to deposit and trade their shares in a concealed

8    control scenario.

9            If Mr. Destler had told David Hunt, "I am partners with

10   Mr. Danks.  We do all this Touchstone together -- all this

11   Touchstone stuff together," then there would have been a whole

12   bunch of roadblocks and breaks that would have been applied to

13   depositing and trading the stock, to margining the stock in the

14   way that Mr. Destler did for well over a million dollars.

15           And so it was part of the scheme to make those false

16   statements for the purpose of concealing from the market that

17   there was this group that had reportable blocks of stock.

18           **THE COURT:**  Okay.  Anything else that you want me to

19   look at with respect to Mr. Destler?

20           **MR. PILCHAK:**  Yeah.  I would just point out -- we made

21   this point, I think, twice in our briefing.  But there is this

22   whole push-and-pull about whether Loop stock price was

23   artificial, whether its stock chart reflected real market

24   activity or not.  We put it at the beginning of our brief

25   because it seems significant to us.

1    Mr. Destler straight up told Dr. Griffiths that $18
2  price point was an artificial price, and we never belonged
3  there.  We got there because of an artificial market.  That
4  seems like a pretty clear admission to us that he knew he was
5  going on, and he recognized that that price was not a legitimate
6  price for Loop but was the result of artificiality.

7        **THE COURT:**  Okay.  Let me hear from the defense on
8  Mr. Destler.

9        **MR. MILLER:**  Yes, your Honor.

10       Securities fraud can be -- securities fraud requires
11 either a material misrepresentation or an omission where there's
12 a duty to disclose in connection with the purchase and sale --
13 purchase or sale of a security.  It's got to be material, and
14 it's got to be in connection with the purchase and sale.

15       The Wilson-Davis doesn't fit into that criteria.  There
16 was no fraud in connection with Wilson-Davis.  The evidence was
17 undisputed during the trial that Mr. Destler sold approximately
18 350,000 shares in private sales, not through the market, before
19 the company went public at the end of 2015.  Those shares
20 didn't -- it's undisputed.  There was no contrary evidence from
21 the Government.

22       Those shares did not hit the transfer agent until 2016.
23 So as a matter of undisputed fact, there was no -- he wasn't
24 over 5 percent, and there was no fraud in connection with the
25 purchase or sale, no materiality.  That's that issue.

1          As far as hiding, which I -- I agree with the Court, I

2    sat through this whole trial, and I kept saying to myself,

3    Where's the fraud?  Where's the beef?  And what did he do wrong?

4    What did he do criminal?

5          And he didn't hide anything.  He didn't try to pull the

6    wool over anybody's eyes.

7          In the original 8-K that Mr. Destler signed on behalf

8    of his company, Touchstone, his shareholdings from the reverse

9    merger are disclosed.  Everything is disclosed.  He never sought

10    to hide anything.

11          His shareholdings, even though they weren't timely

12    recorded sometimes, were always recorded with the transfer

13    agent.  He made no effort to hide anything at any point in time,

14    made no effort to deceive anybody at any point in time.  He was

15    not involved in the so-called manipulative trades.

16          This is all undisputed.  He was not in the loop on

17    that.  That was -- the other defendants were involved in that.

18    And I don't really have any comment on whether that was legal or

19    illegal.  It's really not my business.

20          He didn't do anything criminal in this case.  So I

21    think the evidence is not only thin, it's pretty much

22    nonexistent.  So I'd submit it unless your Honor has some

23    questions.

24          **THE COURT:**  Anything further you want to say with

25    respect to Mr. Destler?

1          **MR. PILCHAK:** Just a few things your Honor.

2          As to materiality, even the defense expert,

3   Mr. Weintraub, I believe admitted -- and certainly was

4   uncontradicted testimony from Mr. Melley -- that it's material

5   to the market to know who the significant shareholders in a

6   company are.

7          So I think materiality, if you're talking about

8   concealing from the market that there's a secret group of -- if

9   you add Danks and Destler together, you know, 11, 12, 13 percent

10  shareholders in Loop, that's information that is *per se* material

11  to the market.  So if a jury could conclude, and I submit a

12  juror could, that that was concealed from the market as part of

13  the charged scheme, that is material.

14         As to this puzzling assertion from Mr. Destler's

15  counsel that it was undisputed that Mr. Destler sold 350,000

16  shares in these stock purchase agreements before Loop even

17  existed, mostly, I think we did challenge that evidence at

18  trial.  Not all of the stock purchase agreements were even

19  admitted in evidence.  The ones that were, we had a hard time

20  matching up with Mr. Destler on the stand to his own accounting

21  experts -- his own accounting records.

22         But even if you sweep those to the side, no defendant

23  has ever tried to grapple with Vertical Leap Advisors, which is

24  an entirely separate entity that Mr. Danks and Mr. Destler owned

25  together, that at one time, and I think at the time of the

1    Wilson-Davis disclosures, owned something like 225,000 more

2    shares of Loop, an entity that's legally owned by both

3    defendants together.

4          We would submit that all by itself, that shows

5    coordination between Mr. Destler and Mr. Danks of their Loop

6    holdings.  It certainly throws off all of the numbers in the

7    Wilson-Davis disclosure.  Nobody's ever made an attempt to

8    explain that or grapple with that.  And we would submit that's

9    further evidence of concealment.

10         **MS. CHOPRA:**  And just briefly, your Honor, just to

11   point out.  The Court read the briefs.  But even the Supreme

12   Court has stated for materiality, it's whether the information

13   available has altered the total mix of evidence -- the total mix

14   of information that an investor could see or learn from the

15   market.

16         In this case, sure, we can parse hairs between each

17   defendant of what this defendant did versus this defendant, how

18   this might be innocuous.  But putting together the total mix of

19   the lack of disclosures and false statements and

20   misrepresentations and trading practices, that altogether as

21   part of the scheme, that altered what an investor would see in

22   the market.

23         So that's the bulk of the argument here, that each

24   individual thing can be explained away.  But the point is the

25   total mix is what is altered here.

1      **THE COURT:**  Okay.  Let's talk about Mr. Danks.  And I

2   think I'd like to hear from Mr. Hall first.

3          I think, unfortunately for Mr. Danks, at the very least

4   it seems to me he concealed his role on the board of directors

5   while using Ventanas Capital to raise money.  The jury could

6   certainly find that he was the one doing the trading, not

7   Michelle Fiore.  It was raising money for himself and his son,

8   or at the very least for his dependent, Michelle Fiore, that

9   there were a bunch of false names in there.

10         And so I think there's sufficient evidence -- and we're

11  at Rule 29.  This is not -- I'm not acting as a juror.  I think

12  there is sufficient evidence, just looking at that limited

13  evidence, to submit it to a jury.  So that's sort of my

14  tentative on Mr. Danks.

15         Mr. Hall?

16     **MR. HALL:**  Your Honor, I would like to tie this -- my

17  argument in to emphasize what the intent was.  And it's clearly

18  an essential element of the manipulative scheme.  And I won't

19  use the phrase "pump-and-dump."  But identifying what the

20  Government's theory of the manipulative scheme was is critical

21  to understanding some of -- to understanding why that is not

22  sufficient evidence.

23         And their scheme was that Mr. Stephens, along with

24  Mr. Bajic, owned a number of nominee entities, that those

25  nominee entities were then controlling the stock that was not

1    disclosed to the public.  That's part of what the scheme was.

2            There's nothing to suggest that when Mr. Danks is on

3    the board, first of all, he's disclosed -- the whole world knows

4    he's on the board for legal purposes.  And he's also disclosed

5    in his Form 8 that he owned 1.4 million -- or controlled

6    1.4 million shares.

7            And so when he is selling the stock for Ventanas, and

8    whether he is concealing it or not, it has to be tied into what

9    his intent was and whether that intent was to conceal his

10   ownership.

11           **THE COURT:**  Isn't that a jury issue?

12           **MR. HALL:**  Well, I believe that -- look, at this point

13   the answer, I guess, is yes to some extent.  But the point that

14   I wanted to emphasize is that there is a lack of evidence

15   showing that Mr. Danks ever intended to join into this

16   manipulative scheme from the beginning, and there was a lack of

17   evidence to show that even his trading in Ventanas, or if he

18   didn't truthfully disclose Touchstone, as the Government has

19   conceded, there is nothing to suggest that that was part of an

20   intent to defraud or to join and participate in this

21   manipulative conspiracy and manipulative scheme.

22           We would concede that a number of these text messages

23   are suspicious.  But it's that lack of evidence to suggest a

24   nexus between him and Mr. Stephens other than one email, I

25   believe, and that there were some sales from Stephens.  But they

1    were done in Stephens's name to Mr. Danks and to Mr. Destler,

2    not in the name of some other artificial entity.

3        **THE COURT:**  The problem I have is that's Part 1.  But

4    then you've got Part 2, 3, 4.  And Mr. Danks is right in the

5    middle of all -- Part 2, 3, 4 as well.

6        And I understand the argument that I wasn't hiding it

7    from the market, I was hiding it from my wife.  That's certainly

8    an argument that can be made.  But I think that's a jury issue

9    as to why he was hiding what he was doing, because he clearly

10   was hiding what he was doing.

11       **MR. HALL:**  I'm not disagreeing with your Honor.  What

12   I'm saying is that, though, what is the evidence to show --

13   other than speculation, what is the evidence to show that his

14   intent to defraud, that his involvement in this manipulative

15   scheme was that purpose; right?  As opposed to what was here.

16       What -- I understand that there are inferences that can

17   be drawn.  But I think it's speculative, and there's

18   insufficient evidence to support that intent.  And I'd submit on

19   that.

20       **THE COURT:**  Government?

21       **MR. PILCHAK:**  So I certainly free with the Court that

22   there's more than enough evidence to go to the jury just on this

23   prong of the conspiracy.  If the Court will indulge me while I'm

24   talking, can I show the Court one exhibit that I think

25   explains --

1          **THE COURT:**  Sure.

2          **MR. PILCHAK:**  And I'll present the other part of the

3     argument to be efficient while I'm doing this.

4          The other part of the argument is that even with

5     respect to Part 1 of the conspiracy -- even with respect to

6     Part 1 of the conspiracy involving Dave Stephens, it's

7     significant to the Government that there was a parallel between

8     Mr. Stephens's conduct and Mr. Danks's conduct.

9          And so we think that it's a hard argument to get out

10    from under to say this Dave Stephens stuff that happened in --

11    you know, early in the conspiracy, that is entirely separate

12    from me.  You can't lay that on me.  You can't prove that I was

13    involved in that.  That was Mr. Stephens concealing his

14    ownership and control in these straw entities.

15         And then when Mr. Danks takes over for his part of the

16    conspiracy, he has his own nominee entities that are controlling

17    stock and shielding trades from the market and hiding the true

18    owners.

19         We think we're entitled to argue to the jury, even as

20    to Phase 1, that that strong parallel between what Stephens did

21    and then what Mr. Danks does when he picks up the baton shows

22    that it is part of the same conspiracy and scheme, even if there

23    is not a text where Mr. Danks says to Dave Stephens, "Let's do

24    securities fraud together."

25         So turning to this, we also think the economic reality

1    of the transactions shows that it's a web of entities and people

2    operating together and not just that there's some weird Ventanas

3    chapter that's happening by itself.

4           This is Exhibit 533 that was admitted at trial.  And

5    what this shows is Ventanas Capital, you know, and Mr. Danks

6    telling his former girlfriend's entity who was in control of it

7    a hundred percent, that selling 120,000 shares of Loop to Allen

8    Brennan, but half of those shares are from the Danks Family

9    Trust, and half of them are from Touchstone.

10          And we're just totally mystified by this at the

11   prosecution table because the testimony was that Don Danks

12   wanted to set up Michelle Fiore so she could be economically

13   self-sufficient and she could make a life for herself.  And here

14   is half of this block of shares being sold to Allen Brennan that

15   comes from Touchstone, which is supposedly Mr. Destler's entity,

16   a hundred percent, that has nothing to do with Don Danks.

17          And then the lion's share of the money here, you can

18   see from the chart, gets paid back to Touchstone Advisors with

19   no -- zero dollars that we could find being paid to Danks Family

20   Trust, and a much smaller slice of the pie staying with Ventanas

21   Capital.

22          And so we think that we're entitled to argue to the

23   jury that transactions like this show that there isn't

24   independent economic reality to these nominees.  At least some

25   of the time, they're just being used as this mush of names to do

1    these securities transactions in a way that benefits the

2    defendants because they're working together.  So we think that's

3    a jury question, your Honor.

4            THE COURT:  Anything further for Mr. Danks or --

5            MR. HALL:  No, your Honor.  I'd submit.

6            THE COURT:  Anything further?

7            MR. YOUNG:  Your Honor, I would just like to reiterate

8    the whole concept of beneficial ownership.  At the core of all

9    of these transactions, all of these allegations, is the idea

10   that Mr. Destler is purporting to hide Mr. Danks's ownership in

11   Touchstone.

12           And if he has ownership over any of the stock that's in

13   Touchstone, it's -- you determine that through the concept of

14   beneficial ownership, which the Government's own witnesses

15   testified has to do with essentially follow the money or follow

16   the voting rights.

17           There was no evidence presented to the jury in any

18   capacity that Mr. Danks ever had any control, any legal control

19   or financial control, of a single share of Loop stock that was

20   held by Touchstone.

21           They had all the bank records.  They have all the tax

22   records.  They have every financial record that they could find

23   and presumably every record there is, and they never made a

24   single link between a Loop stock held with Touchstone back to

25   Mr. Danks.

1    Without that evidence, there's nothing for the jury to

2    conclude that Mr. Danks was the beneficial owner of any of these

3    stocks.  Therefore, that theory, that concealment, it doesn't

4    exist.  There's no evidence that Mr. Danks had any ownership,

5    legal ownership, beneficial ownership, over any of that stock.

6         *MR. PILCHAK:*  Just on that point, your Honor?

7         *THE COURT:*  Yes.

8         *MR. PILCHAK:*  We would point the Court to Exhibit 761,

9    which we referenced in our response and then attached.  It's an

10   early email in the scheme where Mr. Danks seems to be directing

11   the disposition of Touchstone shares.

12        And in everyone's definition, beneficial ownership

13   isn't just who has the legal on-paper power to vote a stock or

14   receive the money or dispose of it.  It's also someone who has

15   the power to direct the disposition of a stock.

16        And we think that transactions like Exhibit 533 that we

17   were just showing the Court, we think that emails like

18   Exhibit 761 show that Don Danks did have at least some power to

19   direct the disposition of Touchstone shares as part of his

20   arrangement with Mr. Destler.

21        *THE COURT:*  Okay.  What I would like to do, I have

22   actually been in trial until Friday with another white collar

23   fraud that was lasting a month.  So I -- what I would really

24   like to do in this case is read through all the transcripts

25   again, which is going to take me some time, and kind of go

1    through this.

2            I've told you kind of what my preliminary thoughts were

3    finishing the trial, and so now I want to go and make sure that

4    I'm not missing something.  But that's kind of what I would like

5    to do, is take it under submission and spend some time reading

6    through the transcripts.

7            In the meantime, I think we should reserve a trial

8    date.  Hopefully, I can get through this by the end of the year,

9    would be my thought, to come up with a ruling on the Rule 29

10   motion.

11           Unfortunately, I did see, Mr. Hall, your schedule.  And

12   I say "unfortunately" because it absolutely dovetails with dates

13   that I have available.  So in other words, I could start this

14   trial on the 17th of March, but it sounds like I'm not sure

15   that's going to give us enough time.

16           And then I'm free the entire month of April, but you're

17   gone the entire month of April.  We can start it May 5th, but

18   I'm gone starting the 26th of May.  So that would give us three

19   weeks.  We could -- if we maybe try it in three weeks.  Or if we

20   want to be absolutely certain, we can start the 2nd of June.  So

21   that's kind of what my schedule is.

22           Let me start with you, Mr. Hall.

23           **MR. HALL:**  Of those dates, I think June 2nd would be

24   what my preference would be, your Honor.

25           **THE COURT:**  Okay.

1          **MR. HALL:**  I have a December trial.  I have a February

2    trial set right now.  I believe the Government counsel has a

3    March trial, if I'm not mistaken, as well.

4          **THE COURT:**  Would June 2nd work for the Government?

5          **MS. CHOPRA:**  Your Honor, it works for Mr. Pilchak and

6    I.  But two of our key witnesses, two FBI -- an agent and

7    forensic accountant, they have conflicts in the beginning of

8    June.

9          **THE COURT:**  Can we work around it if we set it at the

10   beginning of June?  I mean, this trial goes on for a while.

11         **MS. CHOPRA:**  I think they're paid vacations,

12   your Honor, out of state and out of country.

13         **THE COURT:**  That's fine, but, I mean, can we just

14   schedule them as witnesses later on in the case?

15         **MS. CHOPRA:**  We can work around it, your Honor, I

16   suppose, if we do early June.  It's not ideal, but if that's

17   what the Court's calendar is, then we can work around it.

18         **THE COURT:**  Given the fact that Mr. Hall is out the

19   month of April, that kind of puts a damper on things.

20         Let me hear from Mr. Doyle and Ms. Hall.  Would

21   June 2nd work for the two of you?

22         **MS. HALL:**  Yes, your Honor, June 2nd would work.  I

23   would also suggest or ask -- request a further *in limine*

24   hearing.  As indicated in our Rule 29 papers, we think that we

25   have a basis based on the first trial to move to exclude certain

1    evidence on a retrial.

2           And in addition, I don't know if the Court would

3    appreciate it, but we're certainly willing to come in for

4    another hearing after you finish the transcripts if you have any

5    questions on how certain evidence in the transcripts fits in

6    with the case law.

7           **THE COURT:**  If I have questions, I'll set it for a

8    hearing.

9           June 2nd, would that work for you, assuming you're

10   still in the case?

11          **MR. MILLER:**  Obviously, our first choice is to not be

12   in the case.  This is really a cloud over Mr. Destler.  I mean,

13   it's really a problem for Mr. Destler.

14          We'd like -- if the Rule 29 is not granted, we'd like

15   to go to trial the next day.  That would be our preference, or

16   be severed out and go to trial separately.

17          Subject to that, yeah, June 2nd works.

18          **THE COURT:**  I start a six-week white collar fraud trial

19   at the end of January.

20          **MR. MILLER:**  We don't want to be difficult.  We

21   understand everybody else has got calendars.  But this is --

22   this is really a problem for Mr. Destler, his family.  It's like

23   a nightmare.

24          **THE COURT:**  Okay.  Let's set a date of June 2nd for

25   trial.  I will work on the Rule 29 motion.

1    When I issue a ruling on the Rule 29 motion, I'll also

2 take a look at whether I think we need additional motions

3 *in limine*.  I'm not a huge fan because you guys have pretty much

4 briefed every possible motion we could have in this case.  So I

5 feel like I'd be giving it an extraordinary amount of time given

6 the rest of my schedule.

7    So I'll take a look at it.  If I think I need

8 additional motions *in limine*, I'll schedule additional motions

9 *in limine*.  Otherwise, we'll just retry the case if we're going

10 to retry the case.

11    **MR. PILCHAK:**  Thank you, your Honor.  We appreciate all

12 the consideration and time, and especially with scheduling.

13    I just wanted to add for the record, given Mr. Miller's

14 comments, the Government would have been prepared to go in

15 April.  So we're also sensitive.  We're trying to move this

16 forward as well.  You know, we're not requesting a June trial

17 date.  It's just that's what the calendars look like.

18    **THE COURT:**  Mr. Hall had the good sense to alert me in

19 advance to his concerns, so I didn't come in bound and

20 determined to set it for March 17th.

21    **MR. HALL:**  I can't tell you how many vacations I've

22 missed for trial schedules.

23    **THE COURT:**  Okay.  June 2nd for trial.  You're ordered

24 to be here.  In the meantime, I will go through all the

25 transcripts and take a look at the Rule 29 motion.

1          **MR. PILCHAK:**  As to the Speedy Trial Act, your Honor?

2          **THE COURT:**  Because of the pending motions, I will

3    exclude time.  Thank you.

4          **MR. PILCHAK:**  Thank you.

5          **MR. HALL:**  Thank you, your Honor.

6          **MR. YOUNG:**  Thank you, your Honor.

7          **MR. MILLER:**  Thank you, your Honor.

8        **(Proceedings adjourned at 10:43 a.m.)**

9                              ***

10                     *REPORTER'S CERTIFICATE*

11          I, Anne Roldan, certify that I am a duly qualified
     and acting Official Court Reporter for the United States
12   District Court, that the foregoing is a true and accurate
     transcript of the proceedings as taken by me in the
13   above-entitled matter on October 28, 2024; and that the format
     used complies with the rules and requirements of the United
14   States Judicial Conference.

15   Date:  November 5, 2024

16

17   _____
     *Anne Roldan, RMR, CRR, CSR 13095*

18

19

20

21

22

23

24

25